GERAL W. DIETZ AND JOHANNA C. DIETZ,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7147–72.    Filed July 31, 1974.

Geral W. Dietz and Johanna C. Dietz, pro se.
*Howard S. New*, for the respondent.

QUEALY, *Judge:* Respondent determined deficiencies in the Federal income tax of petitioners for the taxable years 1968 and 1969 in the amounts of $1,926 and $694.46, respectively.

Due to concessions by the parties, the sole question before the Court for decision is whether any of the amounts paid to petitioner Johanna C. Dietz by the University of Texas Southwestern Medical School from the National Institute of Mental Health grants in each of the taxable years 1968 and 1969 for her participation in that school's residency program in general psychiatry is excludable from gross income as a fellowship grant pursuant to the provisions of section 117.[2]

### FINDINGS OF FACT

Some of the facts have been stipulated. Such facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioners Geral W. Dietz and Johanna C. Dietz are husband and

---

[1] The following cases were consolidated herewith for purposes of trial only : Thomas A. Woods and Georgialy W. Woods, docket No. 7120–72 ; Donald D. and F. Diane Fagelman, docket No. 7633–72 ; Byron L. Howard, Jr., and Sharon K. Howard, docket No. 8532–72. Separate opinions will be issued for each case.

[2] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

wife whose place of residence at the time of the filing of the petition herein was Dallas, Tex. Petitioners filed timely joint Federal income tax returns for the taxable years 1968 and 1969.

Johanna C. Dietz (hereinafter referred to as petitioner) received a doctor of medicine degree from the University of Texas Southwestern Medical School, Dallas, Tex. (hereinafter referred to as Southwestern), in June of 1963.[3] She was licensed to practice medicine in the State of Texas in August of 1963. Southwestern is an organization described in section 501(c)(3) and exempt from tax under section 501(a).

In June of 1964, petitioner completed a 1-year rotating internship at the Bernalillo County Hospital in Albuquerque, N. Mex. From 1965 to June of 1967, she was employed as a consulting physician in the Public Health Service, Indian Health Division, at Shiprock, N. Mex.

In July of 1967, petitioner entered a 3-year residency program in general psychiatry at Southwestern. Granted a temporary leave of absence for pregnancy beginning in April of 1969, she returned to complete her residency in August of 1971.

The residency program at Southwestern was coordinated with several hospitals in the Dallas area.[4] The residents would often be rotated through several of these affiliated hospitals during the course of their training, in addition to being assigned to certain psychiatric clinics operated by Southwestern. The clinics were organized to provide certain facilities or experience that was required for an approved residency in general psychiatry but was not available at any of the affiliated hospitals.[5]

During the years in question, petitioner was assigned to both Parkland Memorial Hospital (hereinafter Parkland) and Woodlawn Hospital (hereinafter Woodlawn). These hospitals were both operated by the Dallas County Hospital District (hereinafter referred to as DCHD), a public body created and organized under the laws of the State of Texas primarily for the purpose of supplying medical care to indigent and needy residents of Dallas County.

Pursuant to an agreement between the DCHD and Southwestern in 1967, it was agreed that Southwestern would be responsible for staffing both hospitals with "a sufficient number of qualified physicians to adequately direct and supervise professional medical services to all inpatients and outpatients" at Parkland and Woodlawn. Accordingly,

---

[3] The issue presently before the Court involves only Johanna C. Dietz as a result of concessions made by her husband, Geral W. Dietz.

[4] The official title of the program was "Southwestern Medical School Affiliated Hospitals Residency Program."

[5] In order for a residency program to be approved by the American Board of Psychiatry and Neurology and the Council on Medical Education of the American Medical Association, it had to meet the requirements of the Essentials of Approved Residencies, which are published by the Council for each specialty or service.

the permanent staff at both hospitals is drawn directly from the faculty of Southwestern, and the doctors who serve as heads of the departments, divisions, or services of Southwestern, assume the same positions of authority at the hospitals. In exchange therefor, Southwestern was granted the opportunity to use the hospitals' facilities for clinical teaching and research for its medical students, interns, and residents under conditions of actual responsibility for patient care.

Parkland is a general hospital which serves as the primary teaching facility of Southwestern and is located immediately adjacent thereto. Woodlawn is a special hospital which is located at some distance from Southwestern and is primarily devoted to the treatment and care of adolescent and adult patients with serious mental and nervous disorders. Both hospitals admit patients on the basis of their medical need rather than restricting admissions to cases involving unusual teaching aspects.[6]

The residents were appointed to these hospitals by the DCHD upon the nomination of the chiefs of the appropriate department, division, or service responsible for the supervision and training of such personnel. Pursuant to the terms of the above agreement, the expense of hiring such interns or residents was borne entirely by the DCHD although Southwestern agreed to assist where it was able to obtain special funds for the training programs of certain interns and residents.

From January through June of 1968, petitioner was assigned to Woodlawn where she worked approximately 30 hours per week. She was also assigned to emergency room call at Parkland approximately every fifth to eighth day, including weekends and holidays. Weekday emergency call required staying at the hospital for 15 hours while weekend call required 24-hour attendance. When on emergency room call, she was the only physician of her service physically present at the hospital.

From July of 1968 until April of 1969, at which point petitioner took her leave of absence for pregnancy, she was assigned to the outpatient psychiatry clinic at Parkland where she spent approximately 22 hours per week. She continued to serve on emergency room call at Parkland throughout this period.

Petitioner's duties at both Parkland and Woodlawn were similar to those of any salaried staff physician and included responsibility for the care of all her patients on her assigned ward, evaluating and treat-

---

[6] During 1968 and 1969, Parkland admitted over 330 psychiatry inpatients and had an average daily psychiatry inpatient census of more than 40, representing 14,600 inpatient days. With respect to psychiatry followup matters, approximately 6,000 persons or an average of 16 or 17 persons per day were treated through the hospital's outpatient clinic and emergency room.

ing patients, direct responsibility for the diagnosis and treatment of patients, acting as a consultant on referrals from other specialties, prescribing drugs, writing patients' histories, and discharging and admitting patients. Patients were assigned to petitioner on the basis of rotation, not on the basis of the training aspects of the case. Throughout this period, her work was subject to close supervision and direction of the medical staff at the hospitals. Being listed on the house staff of the hospitals, petitioner was neither registered as a student nor was a candidate for any academic degree.[7]

Almost all of the duties performed by the petitioner and other residents for the DCHD would have required the attention of a staff physician had the petitioner and other residents not been available. The additional presence of the residents enhanced the quality of medical care the DCHD offered to its sick and indigent patients.

Concurrent with her general duties at Parkland and Woodlawn, petitioner was also assigned to certain clinics. From July of 1968 through December of 1968, she participated in the general outpatient psychiatry program at Parkland which required approximately 13 patient-related hours per week at the assigned clinics. From January of 1969 through April of 1969, she was assigned to clinics in the community psychiatry rotation which involved petitioner working as a consultant in community settings. The time spent by petitioner at these clinics varied from 4 to 12 patient-related hours per week. Throughout the entire period, she spent an additional 10 to 12 patient-related hours per week at the Adult Psychiatry Clinic at Southwestern.

The training the petitioner and other residents in general psychiatry received from the duties they performed at Parkland, Woodlawn, and the clinics was essential for an approved residency in psychiatry. Another prerequisite was formal didactic instruction by means of prepared lectures, seminars, assigned reading, roundtable conferences, journal clubs, and lectures by visitors. Throughout her residency, petitioner attended such didactic instruction which, dependent upon her rotation, would account for approximately 10 to 15 hours a week.

During the entire period in question, petitioner was under contract with the DCHD. By the terms of the contract, she agreed to "conform to all rules and regulations governing the institution, discharging all duties of House Staff Officer as determined by the Management and Staff." Upon satisfactory completion of her duties as a resident or intern, the DCHD agreed to issue a certificate indicating satisfactory performance of such duties. Such certificate would be forfeited if she failed to remain in service for the full time of her contract. The contract further provided that petitioner was prohibited from engag-

---

[7] "House staff" is a term used to refer only to residents and interns.

ing in any form of private practice except in those instances which had been given prior approval and which applied to all members of the house staff.

While on house staff at Parkland and Woodlawn, petitioner had Federal income and insurance contribution act taxes withheld from monthly payments from the DCHD which kept employee records on petitioner reflecting an hourly wage rate and a specific job code number. Petitioner also received 2 weeks' paid vacation per year, free hospitalization coverage and medical care, free laundry for uniforms, a meal allowance, sick leave, and was eligible to join the DCHD employees credit union.

During 1968 and 1969, petitioner was paid $3,991 and $1,828.19, respectively, by the DCHD for the services she performed at Parkland and Woodlawn. She excluded none of these amounts from gross income for the years in question and has conceded they represent compensation for services performed.

Petitioner also received during 1968 and 1969 the amounts of $4,549.98 and $1,604.16, respectively, from Southwestern for her participation in that school's residency program in general psychiatry. None of the amounts paid to petitioner by Southwestern was determined on the basis of financial need, but on the basis of a fixed sum for each level of residency, increasing yearly as the resident attained additional skill and experience. The source of these funds was the U.S. Department of Health, Education, and Welfare, Public Health Service, National Institute of Mental Health (hereinafter referred to as NIMH) trainee stipend grants to Southwestern.

The NIMH publication entitled "Grants and Awards of the National Institute of Mental Health for Graduate and Undergraduate Training" (December 1966) states the primary purpose of such grants is "to improve the quality of mental health training; to enlarge the capacity for training people; to help in the development of specialized training programs; and, through trainee stipend awards, to enable a greater number of persons to pursue careers in the mental health disciplines and related areas."

The publication further provides that such grants are not awarded directly to individuals by the NIMH but that the training institutions are charged with the disbursement of funds. Aside from a few minimal educational and citizenship requirements, the selection of qualified recipients is left entirely up to the discretion of the grantee institution.

Receipt from Southwestern of such training stipends funded by the NIMH grants was conditioned upon satisfactory participation in all aspects of the residency program. Those residents who received equivalent amounts of money from other sources were not selected

for NIMH grants so that a uniformity of pay scale could be maintained at each level of residency.[8]

On her joint income tax returns for 1968 and 1969, petitioner excluded from gross income $3,600 and $1,129.17, respectively, of the amounts received from Southwestern as excludable fellowship grants. Respondent contends none of the amounts received from Southwestern are excludable.

## OPINION

The sole issue for our decision is whether any of the amounts paid to petitioner by Southwestern from NIMH grants in each of the taxable years 1968 and 1969 for her participation in that school's residency program in general psychiatry is excludable from gross income as a "fellowship grant" under section 117.

Section 117 excludes from gross income any amounts, with certain limitations, received as a "fellowship grant." [9] The statute itself fails to define the meaning of such term. Section 1.117–3(c), Income Tax Regs., however, defines "fellowship grant" as "an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." Section 1.117–4(c), Income Tax Regs., further provides that amounts paid as compensation for services or primarily for the benefit of the grantor are not to be considered as fellowship grants for purposes of section 117:

Sec. 1.117–4 Items not considered as scholarships or fellowship grants.

The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.* (1) Except as provided in paragraph (a) of § 1.117–2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.

However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of

---

[8] For instance, the residents in psychiatry who were assigned to either the Veterans Administration Hospital or Terrell Hospital, which was run by the State of Texas, would receive as a base salary from those hospitals the equivalent of what petitioner received from the DCHD and the NIMH grants combined.

[9] Since petitioner is a nondegree candidate, the exclusion available under sec. 117 is limited by sec. 117(b)(2)(B) "to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year" up to 36 months.

the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant.

The Supreme Court in *Bingler* v. *Johnson*, 394 U.S. 741, 751 (1969), upheld the validity of these regulations as reflecting "the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial *quid pro quo* from the recipients."

The crucial test of the above regulations is whether the primary purpose of the amounts paid is to further the education and training of the recipient or to compensate him for services rendered. *Elmer L. Reese, Jr.*, 45 T.C. 407, 411 (1966), affirmed per curiam 373 F. 2d 742 (C.A. 4, 1967). More succinctly, the question is whether the taxpayer was "paid to work or paid to study." *Stephen L. Zolnay*, 49 T.C. 389 (1968).

Petitioner received certain moneys from both Southwestern and the DCHD while participating in the residency program in general psychiatry at Southwestern in 1968 and 1969. Petitioner has conceded that the amounts received from the DCHD represent compensation for services performed at Parkland and Woodlawn. She argues, however, that the amounts received from Southwestern, which were attributable to NIMH grants made to that school, should be considered as distinct and separate from the payments received from the DCHD. She further argues that such amounts qualify for exclusion under section 117.

Petitioner does not dispute that Southwestern, not NIMH, must be viewed as the grantor for purposes of determining excludability under section 117. See *Marjorie E. Haley*, 54 T.C. 642, 647 (1970); *Frederick Fisher*, 56 T.C. 1201, 1214 (1971). However, she emphasizes that the primary purpose of the NIMH grants to Southwestern, as stated in its bulletin, was to further the educational opportunities of the recipients in the area of mental health and under no circumstances were such grants ever intended by Congress to be used to compensate recipients for services rendered. Absent evidence to the contrary, she contends it must be presumed that Southwestern administered the grants in accordance with the intended objective.

Respondent, on the other hand, views the amounts received by petitioner from Southwestern and the DCHD as inseparable parts of an interrelated and interdependent residency program. As such, he has treated amounts from both sources as compensation for services performed at the DCHD.

Upon careful consideration of the facts, we must uphold the position of respondent. The residency program at Southwestern was coordinated with several hospitals in the Dallas area which included Parkland and Woodlawn. Petitioner was rotated by Southwestern through these two hospitals, in addition to certain clinics, in such a manner as to provide her with the experience necessary to meet the requirements of an approved residency in general psychiatry. Each experience was an integral part of the whole, no part of which could stand alone and still constitute an approved residency program.

The program's unitary character is further evidenced by the fact that the faculty members of Southwestern assumed similar positions of authority and control at the hospitals and clinics affiliated with the program. Moreover, one of the prerequisites for continued receipt of payments from both Southwestern and the DCHD was satisfactory participation in all phases of the residency program.

Under these particular circumstances, we find that the payments received by petitioner from Southwestern and the DCHD are inseparable. Payments from any one of the program's constituent members must be considered as coming from the whole. Cf. *Marjorie E. Haley*, *supra*. In determining whether such payments qualify for exclusion under section 117, we must look to the nature of the services petitioner was required or might have been required to perform for the constituent group as a whole.

In view of petitioner's concession that the payments from the DCHD in 1968 and 1969 represent compensation, we must likewise hold that payments concurrently made to her by Southwestern during these same years also represent compensation. This conclusion is inescapable in light of the significant and valuable services performed at Parkland, Woodlawn, and the clinics during the years in question, all of which involved extensive patient contact. The fact that petitioner derived substantial educational benefits from the residency program does not in any way diminish the compensatory nature of the payments received from Southwestern. See *Aloysius J. Proskey*, 51 T.C. 918 (1969).

Even if the payments made by Southwestern and the DCHD were severable, the amounts paid to petitioner by Southwestern cannot be characterized as "relatively disinterested, 'no-strings' educational grants" as these terms were used by the Supreme Court in *Bingler* v. *Johnson*, *supra*.

Pursuant to an agreement entered into between Southwestern and the DCHD in 1967, which was operative during the years in question, the DCHD was primarily responsible for compensating residents for services rendered at Parkland and Woodlawn. Southwestern, however, agreed to contribute additional amounts of moneys where it was

able to obtain special funds for the training programs of residents such as the ones from the NIMH. The payment of NIMH funds to petitioner by Southwestern during the years in question was merely in satisfaction of its contractual obligation to the DCHD.

In addition, these extra payments obviously aided Southwestern to attract the best qualified applicants to its residency program. It was upon this residency program that Southwestern relied in satisfying another of its contractual obligations to the DCHD, that being to ensure Parkland and Woodlawn were staffed with a sufficient number of qualified physicians to adequately direct and supervise the treatment of patients admitted to these hospitals. There is no question that the quality of patient care at the DCHD was significantly enhanced by the services of the petitioner and other residents. Almost all the duties they performed at the DCHD would have required the attention of a staff physician had they not been available.

The compensatory nature of the NIMH moneys received by petitioner is further reflected by the fact that Southwestern did not select the recipients of such awards on the basis of need. This has been one of the hallmarks of fellowship grants. *Aloysius J. Proskey, supra.* The payments instead were based on a fixed sum for each level of residency, increasing as the resident attained additional skill and expertise.

Clearly, whether we view the payments from Southwestern as severable or not, it is apparent such amounts were merely designed to supplement the amounts paid to petitioner by the DCHD, which she readily concedes were compensation. Our conclusion in this regard is buttressed by the fact Southwestern only awarded NIMH grants to those residents who did not receive equivalent amounts from other sources, resulting in a uniformity of pay scale at each level of residency.

Cases such as *Frederick A. Bieberdorf*, 60 T.C. 114 (1973), and *George L. Bailey*, 60 T.C. 447 (1973), where this Court reached a different result, are distinguishable on the facts.

In accordance with the above,

*Decision will be entered for the respondent.*