JAMES J. FERRERO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ferrero v. Commissioner
Docket No. 5763-72.
United States Tax Court
T.C. Memo 1976-90; 1976 Tax Ct. Memo LEXIS 312; 35 T.C.M. (CCH) 388; T.C.M. (RIA) 760090; March 23, 1976, Filed James J. Ferrero, pro se. Johnny B. Mostiler, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in the amounts of $1,818.32, $2,107.85, and $1,394.08 in petitioner's Federal income taxes for 1967, 1968, and 1969, respectively. The sole issue is whether certain payments received by petitioner qualified as a scholarship or fellowship grant excludable from gross income under section 117. [1]/ *313 FINDINGS OF FACT Petitioner James J. Ferrero was a resident of San Antonio, Texas, at the time his petition was filed. He and his wife filed joint Federal income tax returns for 1967, 1968, and 1969 with the District Director of Internal Revenue, Austin, Texas. Following his graduation from medical school in 1953, petitioner completed a rotating internship at Baptist Memorial Hospital, San Antonio, Texas, on June 30, 1954. Petitioner then went into general practice in San Antonio for a period of approximately 12 years. During that period, he became a member of the Academy of Family Practice (formerly American Academy of General Practice), which required a substantial amount of continuing medical education. Petitioner's practice became progressively more oriented in psychiatry, and this prompted him to enter the residency program at the Austin State Hospital (hereinafter the hospital), where he served as a resident physician during the taxable period in controversy. Petitioner was paid a stipend from funds provided under a Graduate Training Grant from the National Institute of Mental Health (hereinafter referred to as the NIMH). During 1967, 1968, and 1969, he received stipend *314 payments of $12,000, $12,000, and $6,000, respectively. Income and social security taxes were not withheld from these payments. As a resident at the hospital, however, petitioner was credited with vacation and sick leave. Petitioner's duties as a resident were substantially the same as those of the other psychiatric resident physicians, whether or not they were receiving NIMH grants, and included: The interviewing and counseling of patients, the writing of patient histories, conducting physical examinations, prescribing drugs, making diagnoses, putting patients on the critical list if their condition was grave, notifying the local sheriff and the patient's relatives if a patient escaped, consulting on referrals from other specialties, administering shock treatments, attending seminars for approximately 15 hours per week, and attending medical staff meetings. All residents, including petitioner, were required to comply with the hospital's operating manuals and, like staff physicians, were subject to call when needed. Petitioner was required to work "weekend duty," which involved working approximately 1 weekend in every 6 or 8 weeks. Weekend duty could not be declined by a resident, *315 and it involved working from approximately 1 p.m. to 5 p.m. on Friday, 8 hours on Saturday, and 8 hours on Sunday. The wards were so divided that all wards were covered by the physicians on duty. Each resident, especially during the first and second years, was assigned a caseload of approximately 20 to 25 patients. Many of the patients so assigned were treated by the same resident during his entire term of service at the hospital. During the years involved, the hospital had approximately 3,400 patients, with a staff of 26 to 27 full-time physicians and 20 residents. Patients were treated on the team system, which involved a 5-man team, including the director of the service, an administrator, a staff psychiatrist, a nurse, and the resident as junior man on the physician's staff. The resident was a contributing member of the team in treating each patient. The residency program was generally structured so that petitioner worked 6 months with males with mental disorders (1966), 12 months with females with mental disorders (1967), 6 months with adolescents (1968), 6 months with alcoholics (1968), and 6 months in neurology (1969). During the entire 3 years of his residency, petitioner *316 worked directly with patients for approximately 4 to 5 hours each day, 5 days a week. Due to his prior experience as a physician in general practice, he was given a heavy caseload from the start of his work at the hospital. Petitioner usually worked half a day at a time in the out-patient clinic and half a day in the in-patient clinic. In both the in-patient and out-patient clinics, his caseload ranged from 10 to 20 patients; however, sometimes his caseload reached 25 to 30 patients. Many of his patients had to be interviewed daily. As petitioner's experience increased, the difficulty of his cases increased, and he was allowed a progressively greater degree of independence. Approximately once a month, petitioner taught a 1-hour lecture session or conducted a seminar for nurses, master's degree candidates, and Ph.D. candidates in psychology. During his 6 months in the child psychiatry department, petitioner conducted classes and seminars approximately twice a month. His students were master's degree and Ph.D. degree candidates in social work, psychology, or nursing. Each 1-hour class or seminar required approximately 3 to 4 hours of preparation. Residents were responsible for *317 preparing written treatment plans for their patients, after completing diagnoses, and seeing that the treatment plans were carried out. As their residencies progressed, senior residents supervised the more junior residents in certain cases. Petitioner was chief resident in his second year of residency. As senior resident, petitioner would work with other residents in attempting to assure the development of adequate case histories, adequate examinations and treatment programs, and techniques in carrying out the treatment programs, which, in petitioner's case, included teaching group therapy to other residents. On his income tax returns for 1967, 1968, and 1969, petitioner did not include in his gross income the stipend he received from the hospital. Respondent determined (1) that petitioner was not entitled to exclude any of the disputed payments, and (2) in the alternative, that the maximum amounts excludable even if the stipend qualifies under section 117 are $3,600 for each of the years 1967 and 1968, and $1,800 for 1969. OPINION Section 117(a)(1) [2]/ provides that gross income does not include amounts received as a fellowship or scholarship grant at an educational institution. *318 If an individual is not a candidate for a degree, the exclusion is limited to $3,600 per taxable year, sec. 117(b)(2)(B). The section does not apply to payments which constitute compensation for employment services or services subject to the direction of the grantor of the payments. Sec. 1.117-4, Income Tax Regs. See Stephen L. Zolnay,49 T.C. 389 (1968); Elmer L. Reese, Jr.,45 T.C. 407, 411 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967). Petitioner seeks to exclude $3,600 received as a stipend in each of the years 1967 and 1968, and $1,800 received in 1969, citing section 117. Respondent *319 maintains that the disputed payments did not constitute income from a "fellowship grant" but were compensation for petitioner's services to the hospital. We hold for respondent. This case is another one in a long line dealing with the applicability of section 117 to payments to resident physicians. With few exceptions, the payments have been held to be "compensation for past, present or future employment services," not excludable from gross income under section 117. Sec. 1.117-4(c)(1), Income Tax Regs. See, e.g., Geral W. Dietz,62 T.C. 578 (1974); Frederick Fisher,56 T.C. 1201, 1211-1212 (1971), and cases cited therein. Compare George L. Bailey,60 T.C. 447 (1973); Frederick A. Bieberdorf,60 T.C. 114 (1973). Petitioner has not demonstrated that a different result is justified in this case. Petitioner's services were, by his own admission, of substantial value and benefit to the hospital. His daily activities were similar to those of other staff physicians and were carefully supervised by the hospital. Petitioner was required to work according to a schedule established by the hospital. He was one of 46 or *320 47 physicians employed to care for approximately 3,400 patients in the hospital. His services to the hospital included establishing a plan of treatment for his heavy patient caseload, effecting the plan, contacting relatives of patients, and consulting with outside sources. These activities were a few among the many details of a rigorous work schedule and routine, set out in detail in our Findings, which lead us to conclude that petitioner's services were extensively and materially beneficial to the hospital. See Jerry S. Turem,54 T.C. 1494, 1505 (1970); Aloysius J. Proskey,51 T.C. 918, 923-925 (1969). The payments petitioner received were compensation for those services. In two recent cases involving similar NIMH grants to cover the costs of residencies in psychiatry, we reached the same result. See Frederick Fisher,supra, and Geral W. Dietz,supra.We adhere to those opinions. While petitioner quite obviously benefitted from the experience and training he received, that does not mean that his stipend was a fellowship grant. Most workmen receiving compensation for their services learn from experience *321 how to do their jobs more effectively. The payments they receive for those services are compensation, not grants, notwithstanding the beneficial training and experience. See Frederick Fisher,supra at 1215; Aloysius J. Proskey,supra at 925; Ethel M. Bonn,34 T.C. 64, 73 (1960). Decision will be entered for the respondent.
Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.
2. /Sec. 1.117-4(c)(2), Income Tax Regs., states, for the purpose of sec. 117: Sec. 1.117-4 Items not considered as scholarships or fellowship grants. (c) Amounts paid as compensation for services or primarily for the benefit of the grantor.
* * *
(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor. The validity of these regulations was upheld by the Supreme Court in Bingler v. Johnson,394 U.S. 741↩ (1969).