HARJIT S. BHARMOTA and SATYA BHARMOTA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bharmota v. Commissioner
Docket No. 5099-76.
United States Tax Court
T.C. Memo 1979-28; 1979 Tax Ct. Memo LEXIS 500; 38 T.C.M. (CCH) 112; T.C.M. (RIA) 79028; January 17, 1979, Filed *500 Petitioner is a physician employed as a resident in a medical residency program. She excluded certain sums from income under sec. 117, I.R.C. 1954. Held: petitioner is not entitled to exclude any income under sec. 117 inasmuch as her receipts from the residency program were in consideration for services which petitioner was required or might have been required to perform. Dietz v. Commissioner,62 T.C. 578 (1974). J. B. Stubbins, for the petitioners. Andrew M. Winkler, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined deficiencies in petitioners' income taxes for their taxable years ended December 31, 1973 and 1974 in the amounts of $ 934.44 and $ 1,008.12, respectively. After concessions the only issue for decision is whether petitioners may exclude from income under section 117, I.R.C. 1954, $ 1,800 for their taxable year ended December 31, 1973 and $ 3,600 for their taxable year ended December 31, 1974. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and exhibits attached thereto are incorporated herein by this reference. *502 Petitioners Harjit and Satya Bharmota, husband and wife, use the calendar year as their tax accounting period and are on a cash basis of accounting. At the time they filed their petition herein, petitioners resided in Zanesville, Ohio. Petitioners' joint Federal income tax returns for their taxable years in issue were filed with the district director of internal revenue at Cincinnati, Ohio. Petitioner Harjit S. Bharmota is a party hereto solely by virtue of having filed jointly with his wife. "Petitioner" shall hereinafter refer to Satya Bharmota. Petitioner excluded $ 3,600 from her reported gross income in each of her taxable years ended December 31, 1973 and 1974 under authority of section 117. Respondent disallowed these deductions in full. Petitioner has conceded the includability of $ 1,800 of the $ 3,600 she excluded from income for her taxable year ended December 31, 1973. The rest of the amounts excluded under section 117 are still in issue. Petitioner concedes that, if this Court finds that $ 3,600 is excludable from her income for her taxable year ended December 31, 1974, she is not entitled to a $ 750 employee business expense deduction claimed for that taxable *503 year for business mileage. Petitioner is a physician. From June 27, 1972 to June 26, 1973 she was an intern at Harper Hospital, Detroit, Michigan. On January 9, 1973 petitioner applied to the Wayne State University School of Medicine and Affiliated Hospitals Residency Program in Pathology (the program) for admission thereto as a pathology resident. Wayne State University and the hospitals affiliated with it in the Residency Program in Pathology are all organizations described in section 501(c)(3) and exempt from tax under section 501(a). Petitioner was appointed as a pathology resident in the program by letter dated March 21, 1973. Petitioner accepted the appointment on March 22, 1973. Petitioner's first year of residency began on July 1, 1973. The program is a four year course of work and study during which each resident is rotated between the various disciplines related to his area of interest. Petitioner was rotated, during her truncated stay in the program (she left before the end of her second year of residency), to four hospitals and worked in the areas of anatomy, chemistry and cytology. Individual appointments to the program were made on a year to year basis. Reappointment *504 for the next year, and continued resident status during any contract period, depended upon the resident's successful completion of the tasks assigned to him or her. All the tasks petitioner was required or could be required to perform were of value to the hospitals in which she worked while in the program. Petitioner's contract with the program required her to "perform satisfactorily the customary services of trainees at the designated level of training, and such other services as may be required in the training program * * * (b) to comply with the policies, procedures, and regulations of the [program], * * * (c) to acquire and maintain the proper medical licenses * * *." The residents were considered members of the house staff of the affiliated hospitals and were expected to advance the hospital's interests in patient care. A copy of the Housetaff Physician Housestaff Manual for July 1974 was included in the record. The manual applied to all residents in the program, and said in relevant part: You, as interns and residents are responsible for the medical care of all patients assigned to you on your [sic] services and will work under the supervision of attending physicians. *505 These patients must be considered as your patients at all times, although the attending staff are ultimately responsible, legally and morally, for their care. In general residents in the program were subject to the following responsibilities: they were required, or could be required, to write and sign orders, record histories and physicals on each patient seen by the resident, write progress notes for patients' records, make arrangements for boarding and/or surgical procedures, obtain written consent for surgery, complete a death certificate after notifying the attending physician, obtain permission for autopsy, notify the medical examiner in the event of a body dead-on-arrival, complete necessary reports in the case of an in-hospital accident to a patient, report communicable diseases, write discharge orders, and make rounds. Each pathology resident was periodically on call during weekends and holidays.During these on-call periods the pathology resident was expected to perform autopsies. Residents regularly assigned to a hospital were required to work up microscopic slides on all cases autopsied in that hospital while they were on call. Because residents performed these functions, *506 other staff members did not have to. Residents in anatomic pathology assignments were expected to work up microscopic sections and check their work with the staff pathologist. If a staff pathologist was not present at an autopsy, the organs of the decedent had to be saved for later review by one. While on call the resident had to be at home or otherwise within reach by telephone. All residents were required to attend all local resident conferences and were expected to attend the yearly meetings of the Michigan Society of Pathologists. Failure by a resident to fulfill any of these many obligations under his contract authorized the University to terminate unilaterally his contract and dismiss the resident from the program. In return for these substantial services residents received an annual salary. This salary was paid by the hospital in which the resident was working to a central program office which then disbursed it to the resident. The amount of salary received related, without exception, to the resident's post-doctoral year in training. The amount of salary did not relate to economic need. Petitioner was paid at an annual rate of $ 11,200 her first year and $ 11,560 for *507 her second year in the program, which she did not complete. Both Federal income and FICA taxes were withheld from this salary. While petitioner's work related duties were full time, an average of 5 hours a week were devoted to didactic instruction and conferences. In addition to her cash salary, petitioner also received fringe benefits from the affiliated hospitals. Each resident received annual paid vacation time, life and accident insurance, sick pay and disability insurance, malpractice insurance, health insurance, uniforms were supplied and laundered, and sleeping quarters and meals provided while on-call. While a member of the program, petitioner was at no time a candidate for any degree. The Wayne State University School of Medicine did, however, offer a Master of Sciences in Pathology to residents in pathology who completed 14 quarterly courses of formal study and submitted a thesis based on personal work carried out under the supervision of an advisor from the faculty of the Department of Pathology. OPINION The sole issue for our decision is whether any of the amounts paid to petitioner by the Wayne State University School of Medicine and Affiliated Hospitals Residency *508 Program for petitioner's taxable years ended December 31, 1973 and 1974 are excludable from income under section 117. [2]
*509 Section 117 excludes from income, within certain limits, amounts "received" during the taxable year under a "scholarship" or "fellowship grant". On brief petitioner refers to the payments at issue as being both scholarship and fellowship grant receipts. We believe they are neither. To be a "scholarship" the amounts must be received at an educational institution as defined in section 151(e)(4). In section 151(e)(4) the term "educational institution" is defined as being "only an educational institution which normally maintains a regular faculty and curriculum and normally has a regularly organized body of students in attendance at the place where its educational activities are carried on." Section 151(e)(4), section 1.117-3(b), Income Tax Regs. It would not appear that any of the hospitals in which petitioner worked while a resident in the program qualify as such an institution. Indeed, the evidence affirmatively shows these hospitals to be working hospitals whose primary purpose was to heal and care for the sick--not educate students. The parties stipulated, and we have found, that petitioner was not a candidate for any degree while she was a resident. Nor were any other of *510 her fellow pathology residents candidates for any degree unless they affirmatively applied to and were accepted into the formal course of study leading to the Masters Degree in Pathology offered by the Medical School. All candidates for that degree were released from their regularly scheduled duties to attend classes. Clearly, then, the classes were held some place other than where the residents worked. While it may be true that each resident received "[approximately] five hoursper week * * * [of] didactic instruction and conferences," these conferences cannot render a hospital into something it is not, namely an "educational institution". Thus we must determine whether the amounts paid to petitioner were paid as "fellowship grants". The term "fellowship grant" is defined in the regulations as "an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." Section 1.117-3(c), Income Tax Regs. However, no amount paid to an individual is included in the term "fellowship grant" if such amount constitutes "compensation for past, present, or future employment services or represents payment for services which are subject to *511 the direction or supervision of the grantor." Section 1.117-4(c)(1), Income Tax Regs. Further, a "fellowship grant" does not include "[any] amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor." Section 1.117-4(c)(2), Income Tax Regs. Amounts paid to an individual to enable him to pursue studies or research are included in a "fellowship grant * * * if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity." Section 1.117-4(c)(2), Income Tax Regs.
Thus the regulations make clear the distinction that no payments which are not primarily for the benefit of the recipient, aimed at furthering his individual training, can qualify as a fellowship grant. The Supreme Court upheld the validity of these regulations in the case of Bingler v. Johnson,394 U.S. 741, 751 (1969). In that case the Supreme Court bypassed the primary purpose language of the regulations and addressed itself to the fact that "the definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary *512 understanding of * * * 'fellowships' as relatively disinterested, 'no strings' educational grants, with no requirement of any substantial quidproquo from the recipients." Bingler v. Johnson,supra at 751. If there is a substantial quid pro quo the payments cannot qualify for exclusion from income as fellowship grants. Hembree v. United States,464 F.2d 1262, 1265 (4th Cir. 1972). In determining whether there are any strings attached to the payments received by petitioner, "we must look to the nature of the services petitioner was required or might have been required to perform". [Emphasis added.] Dietz v. Commissioner,62 T.C. 578, 585 (1974). It is clear from all the facts that petitioner was required to perform, or might have been required to perform, substantial services in return for the salary paid her.She performed, or could be required to perform, autopsies.She was periodically on call. She could be required to write orders, record histories, obtain permission for autopsies and many other valuable services. Petitioner was paid based on length of service, not financial need. This has been considered *513 an indicium of compensation. Proskey v. Commissioner,51 T.C. 918, 924 (1969). Further, Federal income and FICA taxes were withheld from her income, petitioner got paid vacations, sick leave, malpractice insurance and other fringe benefits indicating her employee status. See Rosenthal v. Commissioner,63 T.C. 454, 460 (1975); and Adams v. Commissioner, 71 T.C.     (1978). Since petitioner's receipts were compensation for services and were not "no strings attached" educational grants, we must hold for respondent. Decision will be entered under Rule 155. Footnotes
1. The notice of deficiency for petitioners' taxable year ended December 31, 1973 reflects an agreed to assessment of the deficiency resulting from a disallowed deduction for household and dependent care services.↩
2. SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS (a) General Rule.--In the case of an individual, gross income does not include-- (1) any amount received-- (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or (B) as a fellowship grant, * * *
(b) Limitations.-- * * *
(2) Individuals who are not Candidates for Degrees.--In the case of an individual who is not a candidate for a degree at an educational institution (as defined in section 151(e)(4)), subsection (a) shall apply only if the condition in subparagraph (A) is satisfied and then only within the limitations provided in subparagraph (B). (A) Conditions for Exclusion.--The grantor of the scholarship or fellowship grant is-- (i) an organization described in section 501(c)(3) which is exempt from tax under section 501(a), * * *
(B) Extent of Exclusion.--The amount of the scholarship or fellowship grant excluded under subsection (a)(1) in any taxable year shall be limited to an amount equal to $ 300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year * * *.↩