FREDERICK E. MARSH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Marsh v. Commissioner
Docket No. 4562-79.
United States Tax Court
T.C. Memo 1980-387; 1980 Tax Ct. Memo LEXIS 197; 40 T.C.M. (CCH) 1242; T.C.M. (RIA) 80387; September 16, 1980, Filed Frederick E. Marsh, pro se. Charles L. Eppright, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioner's Federal income taxes for 1975 and 1976 in the respective amounts of $677 and $155. [1] / The only issue for decision is whether a stipend received by petitioner during 1975 was a scholarship or fellowship grant, so as to be excludable from gross income to the extent of $3,600 under section 117. [2]
*198 FINDINGS OF FACT Some of the facts in this case have been stipulated. Petitioner and his wife (who did not sign the petition) filed joint Federal income tax returns for 1975 and 1976 with the Western Service Center, Internal Revenue Service, Ogden, Utah.At the time the petition herein was filed, they resided in Seattle, Washington. At the date of trial, petitioner was a physician specializing in the practice of psychiatry. He received his medical degree from the University of Kansas in 1969. He then served a 1-year internship at the United States Naval Hospital in Oakland, California, and spent approximately 4 years on active duty in the Navy as a general practitioner. In July 1973, he began a 3-year residency program in psychiatry at the University of Washington (hereinafter referred to as the University) in Seattle, Washington. As a resident, petitioner was not a candidate for a degree. During his first 2 years in the residency program, petitioner was involved in a "standard psychiatric residency" program. At the end of his second year (i.e., June 1975), he was selected to be the chief resident of the University's Department of Psychiatry (the Department) for the *199 period beginning July 1976, and ending June 1977. He was, therefore, placed under the personal supervision of Dr. Carl Eisdorfer, chairman of the Department, for the purpose of grooming petitioner for the post of chief resident and providing him with intensive educational experience concerning the care of chronic mental partients. Subsequently, petitioner decided not to accept the position of chief resident. He completed the residency program on July 1, 1976. The Department is decentralized, operating at a number of different locations. Since a resident may be assigned duty at several of these locations, the Department divides each resident's work week into tenths of a week. Two-tenths of a week is the equivalent of 8 hours. Durng the year in question, petitioner spent two-tenths of his "on-duty time" at the outpatient clinic of University Hospital. His duties were similar to those of any other resident in the Department and consisted of performing "intake evaluations" of new patients, i.e., taking medical and psychiatric histories, performing mental status examinations, and, if necessary, giving physical examinations and ordering laboratory tests. These intake evaluations *200 were performed under the supervision of a psychiatrist on the hospital staff and served as the basis for determining whether a patient was in need of psycotherapy. If psycotherapy was necessary, petitioner would continue to see and treat the patient, subject to the supervision of the staff psychiatrist. Petitioner was assigned to spend another two-tenths of his time at the outpatient clinic of the Veterans' Hospital in Seattle. Half of this time was devoted to work similar to that performed by petitioner at University Hospital, and the other half was spent in conference, apparently with members of the Veterans' Hospital staff. The Veterans' Hospital is affiliated with the University's medical school, and the staff physicians at Veterans' Hospital are all faculty members at the University. Three-tenths of petitioner's time during 1975 was spent investigating the problems of caring for 130 patients, most of whom suffered from chronic mental illness, at a "halfway house" (Wintonia House) located in an old hotel in downtown Seattle. Wintonia House was not affiliated with the University, but many of the patients housed there regularly submitted themselves for "acute psychiatric *201 treatment" at the emergency room of nearby Harborview Hospital (Harborview), which was staffed by the Department. Due to the frequent use of Harborview's emergency room by those patients, the chairman of the Department wished to have a representative at Wintonia House to work with its staff and learn some of the problems of dealing with the patients there. Part of the time that petitioner was investigating the problems of Wintonia House was spent doing research at the University's library. While actually present at Wintonia House, he acted in the capacity of a consultant to its staff. However, he had no direct responsibility for patient care. Petitioner was also assigned to work at the East Side Mental Health Center and at a senior citizens' center during 1975, at each of which he spent one-tenth of his time. [3]/ His only function at the mental health center was to sit in as an observer at staff conferences, although he did take part in the discussions at times. At the senior citizens' center, petitioner was working with a group of mentally well senior citizens who wished to start a senior program in Carnation, Washington. *202 In addition to his regular work assignments during 1975, from January through the end of June, petitioner was on nighttime call once every 15 days for emergencies at University Hospital and the Veterans' Hospital. When on call during this period, petitioner was directly responsible for the treatment of patients requiring psychiatric care in the emergency rooms of those hospitals. He was also on nighttime call, once every 18 days, for the remainder of 1975. However, during this period, he had direct patient contact only on occasion and was primarily responsible for the supervision of other residents who were working in the emergency rooms at Harborview, University Hospital, and the Veterans' Hospital. During 1975, petitioner received a stipend from the University in the total amount of $11,150. For at least part of the year, free meals were available to him when on duty at the Veterans' Hospital. In addition, the University provided office space for his use and allowed him a 2-week vacation and sick leave. [4]/ The University also made available an optional health insurance plan for residents.[5]
*203 There are three principal sources of funds for stipends that are paid to physicians in the residency program in psychiatry at the University: (1) the operating budget of the University Hospital; (2) National Institute of Mental Health funds; and (3) Public Health Service funds. A resident's stipend may be paid from one or more of these sources, but all residents in the same year of the program receive stipends of equivalent amounts and the source of a resident's stipend has no bearing on the nature of his responsibilities and training.The Department, in computing the amount to be paid to each resident, determines the total amount of money available from all sources for payment of stipends to residents and divides it by the number of residents that it wishes to maintain. The number of residents and the amount to be paid as a stipend is then adjusted according to the amount that other universities are paying residents. Stipends are not awarded on the basis of financial need. The stipend that petitioner received during 1975 was paid from the operating budget of University Hospital and from National Institute of Mental Health funds. With respect to the amount paid from the hospital's *204 operating budget ($7,298), the University issued a Form W-2 (Wage and Tax Statement) and withheld income and FICA employee taxes. The portion of the stipend paid from National Institute of Mental Health funds ($3,852) was identified as a "FELLOWSHIP" on a Form 1099 (Statement for Recipients of Miscellaneous Income) issued by the University. No taxes were withheld from this amount. Petitioner, as shown on a sheet attached to his 1975 income tax return, excluded from the gross income reported on that return $3,600 ($300 per month for 12 months) of the stipend as an "EDUCATIONAL DEDUCTION." Respondent determined that the stipend represented compensation for services and that, therefore, no part of it is excludable from petitioner's gross income. OPINION Section 117 provides that, subject to certain limitations, the gross income of an individual does not include any amount received as a "scholarship" or "fellowship grant." [6]/ Although these terms are not defined in section 117, the regulations thereunder define them generally as amounts paid to an individual to aid him in pursuing studies or research. See sec. 1.117-3(a) and (c), Income Tax Regs.[7] The regulations further *205 provide, however, that any amount paid to an individual "to enable him to pursue studies or research" shall not be considered to be a scholarship or fellowship grant "if such amount represents * * * compensation for past, present, or future employment services." Sec. 1.117-4 (c)(1), Income Tax Regs.[8]
*206 In Bingler v. Johnson,394 U.S. 741, 751 (1969), the Supreme Court upheld the validity of section 1.117-4(c), Income Tax Regs., stating that it comports-- with the ordinary understanding of "scholarships" and "fellowships" as relatively disinterested, "no-strings" educational grants, with no requirement of any substantial quidproquo from the recipients. As noted in Hembree v. United States,464 F.2d 1262, 1265 (4th Cir. 1972): [If] there is any substantial quidproquo, i.e., compensation for services, * * * payments cannot qualify for exclusion from income as ["scholarship" or] "fellowship" funds. After reviewing the record, we find nothing to distinguish the instant case from the numerous other cases in which it has been held that amounts paid to medical residents constitute compensation for services rendered and are, therefore, not excludable from gross income under section 117. See, e.g., Parr v. United States,469 F.2d 1156 (5th Cir. 1972); Weinberg v. Commissioner,64 T.C. 771 (1975); Dietz v. Commissioner,62 T.C. 578 (1974) (resident in psychiatry); *207 Fisher v. Commissioner,56 T.C. 1201 (1971) (resident in psychiatry). As detailed in our Fidings, it is clear that petitioner rendered extensive and valuable services in return for the stipend that he received from the University. He is, therefore, taxable on the disputed amounts. Petitioner's position that the stipend was received as a scholarship or fellowship grant is primarily based on the assertion that his assignments to work at Wintonia House, the East Side Mental Health Center, and the senior citizen's center were designed specifically for his own educational benefit. Apparently, no resident had ever been assigned to work in those institutions prior to petitioner and none have since his departure. Notwithstanding petitioner's assertion to the contrary, we think that the University did benefit from his work at Wintonia House, even though that institution was not directly affiliated with the University. Patients from Wintonia House were requesting psychiatric care at the emergency room of Harborview (which was staffed by the Department) on such a regular basis that the chairman of the Department felt that it would be advisable to assign someone to work *208 with the staff of Wintonia House and investigate the problems of caring for its patients.Apparently, this was done in the hope of finding some way to reduce the strain being placed on Department personnel in the emergency room at Harborview. Even if petitioner's activities in this connection are characterized as "straight research," as he contends they should be, it is evident that the research was conducted for the benefit of the Department and not solely for petitioner's educational benefit. See sec. 1.117-4(c)(2), Income Tax Regs.
We have no doubt that petitioner's work as a resident provided him with a richly rewarding, highly educational experience. However, the fact that he was learning while working does not convert an amount paid as compensation for services into a scholarship or fellowship grant under section 117. Proskey v. Commissioner,51 T.C. 918, 925 (1969). On the record before us, we sustain respondent's determination. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. /↩ Since the deficiency for 1976 results from an "automatic" adjustment to petitioner's income averaging schedule for that year, determination of his tax liability for both 1975 and 1976 depends upon our decision with respect to 1975. 2. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
3. /↩ For at least a part of 1975, petitioner spent another one-tenth of his time working at the King County Jail in Seattle, Washington. However, there is nothing in the record to indicate the nature of his duties while working there.
4. /↩ Although there was no formal agreement specifying a certain number of days of sick leave, petitioner was entitled to full pay for days that he may have been absent due to illness. 5. It appears that the University provided medical malpractice insurance coverage for its residents, but this is not entirely clear from the record.↩
6. / As in effect during 1975, sec. 117 provided in pertinent part as follows: SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule.--In the case of an individual, gross income does not include-- (1) any amount received-- (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or (B) as a fellowship grant, * * *. (b) Limitations.-- (2) Individuals who are not candidates for degrees.--* * * (B) Extent of exclusion.--The amount of the scholarship or fellowship grant excluded under subsection (a)(1) in any taxable year shall be limited to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year, * * *. ↩
7. Sec. 1.117-3, Income Tax Regs., provides in part as follows: Sec. 1.117-3. Definitions.
(a) Scholarship. A scholarship generally means an amount paid or allowed to, or for the benefit of, a student, whether an undergraduate or a graduate, to aid such individual in pursuing his studies. * * * (c) Fellowship grants.↩ A fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research. * * * 8. Sec. 1.117-4, Income Tax Regs., provides in part as follows: Sec. 1.117-4.Items not considered as scholarships or fellowship grants.
(c) Amounts paid as compensation for services or primarily for the benefit of the grantor.↩ (1) Except as provided in paragraph (a) of section 1.117-2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor. * * *