MERRILL LEE MEEHAN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2254-74.    Filed July 29, 1976.

Merrill Lee Meehan, pro se.
*Stephen R. Takeuchi,* for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioner's income tax in the amount of $448.26 for the taxable year ended December 31, 1971. The issues for decision are: (1) Whether the amount of $1,935 received by petitioner in 1971 from the Pennsylvania State University for graduate assistant-ships is excludable from gross income under section 117, I.R.C. 1954,[1] and (2) whether petitioner is entitled to deduct under section 162(a) the amount of $468 as expenses (rent and electricity) of maintaining an office in his apartment.

### FINDINGS OF FACT

Certain facts have been stipulated by the parties and are accordingly so found.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the year in issue, unless otherwise specified.

Petitioner Merrill Lee Meehan resided in Munhall, Pa., as of the date of the filing of the petition herein. Petitioner filed his individual income tax return for 1971 with the Philadelphia Service Center, Philadelphia, Pa.

Prior to 1971, petitioner was employed as a teacher of industrial arts in the city of Pittsburgh public school system. In 1970, petitioner was offered an instructorship at the Pennsylvania State University (hereinafter referred to as the university) for the academic year 1970-71. Petitioner accepted the position, and from January 1, 1971, to June 30, 1971, petitioner was employed as an instructor in the Industrial Arts Education Department at the University. As a condition for entitlement to the instructorship, petitioner applied and was admitted to the University's graduate school, specifically that of the Industrial Arts Education Department. For his services as an instructor, petitioner received a gross salary of approximately $600 per month for the 10-month academic year (September 1970 through June 1971).[2]

Sometime in the spring of 1971, petitioner learned that his instructorship position would be eliminated from the Industrial Arts Education Department leaving for the next academic year (1971-72) a department faculty of only two full-time professors. Petitioner then applied for a graduate school grant-in-aid for the summer term 1971, which application was denied in April 1971. Petitioner then applied and qualified for, was offered and did accept, a quarter-time graduate assistantship at the university from the first week in July 1971 to September 24, 1971. Petitioner similarly sought and received a three-quarter time graduate assistantship at the university from September 25, 1971, through December 1971. As a requirement of both the one-quarter and three-quarter time graduate assistantships, petitioner was a degree-oriented graduate student, matriculated as such, and pursued a program leading to a doctor of education

---

[2] In support of his argument (*infra*) that the graduate assistantships at issue herein were awarded to petitioner in recognition of his financial need, petitioner attempted at trial to establish his prior financial status by reference to both his salary as an instructor at the university and his earnings as a teacher in the Pittsburgh school system, which latter amount he estimated to be $1,000 a month. On June 14, 1976, well after the parties' original and reply briefs were filed, we received petitioner's motion to change the transcript and petitioner's original brief by substituting a somewhat higher figure for the estimated $1,000 per month. We have denied petitioner's motion as untimely and believe that to the extent petitioner's prior salary as a teacher is relevant and material herein, his testimony at trial suffices.

degree in industrial arts education with a specialty in teacher education.

The university's manual for graduate students contains the following general information in respect of student employment, fellowships, and traineeships, and graduate assistantships:

## EMPLOYMENT

Many students depend upon part-time employment to help meet their expenses. A student who is thus employed, whether on campus or off campus, must recognize the time demands of his work schedule in planning his academic program. A student holding a fellowship or scholarship may not accept employment of any kind for service beyond that specified by his appointment. Graduate assistants may accept concurrent employment outside the University only after obtaining permission from the head of the department providing the assistantship or from the person in charge of his graduate program. A graduate assistant may not hold an [sic] concurrent appointment with the University other than a Fellowship Supplement.

## FELLOWSHIPS AND TRAINEESHIPS

Fellows and trainees carry full-time graduate programs, receive stipends which vary with the awards, and usually receive grants-in-aid paid by the donors of the awards to provide for all tuition. They may not accept employment during the terms of their appointments (except when stipulated for training purposes), nor are they required to render any service to the University.

## GRADUATE ASSISTANTSHIPS

A large fraction (over 40% in 1970-71) of graduate students hold appointments as graduate assistants. Duties are largely teaching and research which constitute part of the education of the student.

STIPENDS. Stipends range from $318/term (26.50/week) to $1800/term (150.00/week). Assistantships are classified as quarter-time (10 hours of work per week), half-time (20 hours) or three-quarter-time (30 hours). The majority of assistantships are half-time and carry a stipend of $630 to $1,200 per term. Stipends are paid every other week during the twelve weeks of the term. Income and social security taxes are deducted.

APPOINTMENTS. Appointments are usually for four terms, starting with the Summer Term, or for three terms starting with the Fall Term. * * * Offers of appointments are made for at most one year at a time on a standard form which specifies the total stipend, the duration, the weekly hours of service required, and the date and place to which the assistant should report. Graduate assistants, like faculty and other staff of the University, often are assigned tasks which must be carried out during the week preceding the start of classes and during the week following the end of classes each term. If extensive duties other than teaching and research are involved, the offer of an appointment should describe these duties.

RENEWAL OF APPOINTMENTS. Offers of renewal of appointments are made in the same way as new appointments. Offers of appointments are usually made in March or early April for the following academic year. In deciding

whether to offer a renewal, department heads or program chairmen normally consider first the quality of the applicant's service as an assistant and, second, the quality of his academic work as a student. * * *

RESPONSIBILITIES. Although graduate assistants are usually treated as apprentice faculty by their departments or programs, they are primarily students. They are members of the staff (but not of the faculty) of the departments in which they hold their appointments, and as such may be asked to serve on committees and to take part in departmental or program governance in other ways. Graduate assistants may be assigned responsibilities in registration of students for courses and in advising undergraduate students or organizations, as well as in planning and teaching courses. Although a graduate assistant may assist with research he should be distinguished from a research assistant, who is a regular, usually full-time member of the staff in a rank equivalent to instructor.

Graduate assistants are required by state law, as members of the University staff, to sign a statement or take an oath certifying their loyalty. They are expected to maintain the same high standards of ethical and moral behavior expected of faculty members (see the *Faculty Handbook* for further details on ethical relationships).
    * * *

BENEFITS. Graduate assistants receive a number of benefits in addition to their stipends by virtue of their appointments. Among these are:

1. A grant-in-aid (tuition remission) during the term of the assistantship. If a student is appointed to a graduate assistantship for three consecutive terms, he is entitled to a grant-in-aid for the immediately succeeding term. * * *

2. If the assistantship is quarter or half-time, the student is considered by the University to be a full-time student. This status carries various indirect benefits, such as the way in which a male student is regarded by his draft board, eligibility to participate in a group Health Insurance Plan, Ritenour Health Services, and special rates for certain athletic and other events.

3. A graduate assistant is exempted from the fee charged for a student parking permit.

4. If assistantship duties are the same as those required of all graduate students in the assistant's major as a part of the training for the degree sought, the assistant's department head or program chairman will write a letter certifying to this. This letter may be accepted by the Internal Revenue Service as grounds for refunding income tax which may have been deducted from the assistant's stipend.

5. Graduate assistants are listed in the *Faculty/Staff Directory.*

6. Graduate assistants may receive fellowship supplements, which provide stipends in addition to the assistantship stipend.

7. Three-quarter time graduate assistants may purchase football season tickets at the special rates established for staff members.

8. Graduate assistants may receive mail addressed to them at their departmental address.

The university does not classify a graduate assistant as either a regular or nonregular employee. According to the university's

policy manual, a regular employee is defined generally as one "who is appointed to a full-time position that will exist for six months or longer." Conversely, a nonregular employee is:

1. A person who has a special faculty appointment, or

2. A person who fills a position that will exist for less than six months, or

3. A person who is working on less than a full-time work schedule, or whose position title includes the words "part-time."

As a general matter, in ascertaining the number and type of graduate assistantships which it requested for an academic year from the university, the Industrial Arts Education Department reviewed its course offerings and class enrollments and determined therefrom the assistantships needed to complement the department's full-time teaching staff. In granting the graduate assistantships to petitioner, the department not only considered the staff reduction effected by elimination of the instructorship position held by petitioner until June 30, 1971, but also attempted, in view of petitioner's known financial status, to enable petitioner to remain in the graduate program.[3]

During the time of the one-quarter-time graduate assistantship, petitioner worked with his academic adviser on designing and revising curriculum for the Industrial Arts Education Department; petitioner had no teaching responsibilities or formal office-hour requirements. During the fall term, in connection with the three-quarter-time graduate assistantship, petitioner taught two undergraduate courses which met a total of five class periods a week, for 75 minutes a class. In addition, petitioner was an adviser to approximately 20 undergraduate students and maintained a total of five office hours a week which included approximately three-quarters of an hour per week of actual student advising. As stated in the offer made to and accepted by petitioner for the one-quarter-time assistantship, the average weekly hours of service were estimated to be 15 hours; that pertaining to the three-quarter-time assistantship indicated an average of 30 hours a week. For the one-quarter-time assistantship petitioner received a total stipend of $720 (5 bi-weekly payments of $144); for the three-quarter-time assistantship petitioner received a total stipend of $1,216 (6 bi-weekly payments of $202.50). These stipends were considered a

---

[3] For 1971, the year in issue, the chairman of the Industrial Arts Education Department was both petitioner's academic advisor and petitioner's supervisor for his graduate assistantships.

part of the regular operating budget of the university; they were paid from funds budgeted for operation of the Education Department rather than from funds budgeted for "student aid." In respect of each payment, the university withheld amounts for Federal income and social security taxes.

Petitioner received no credit nor grades on his school transcript for the aforementioned work with his academic adviser on designing and revising curriculum as a one-quarter-time graduate assistant nor for his teaching or advising as a three-quarter-time graduate assistant. The Industrial Arts Education Department did not require, as a condition for obtaining the doctor of education degree, that its degree candidates hold a graduate assistantship or perform any curriculum revising, teaching, or student-advising services as did petitioner. Petitioner's thesis topic was not required to relate to his graduate assistantship duties nor was petitioner, by virtue of his graduate assistantships, under any obligation to return to work for the university upon completion of his studies.

As a graduate assistant, petitioner was provided with oncampus office facilities which consisted of a room which he shared with approximately five other graduate assistants.[4] All of these graduate assistants, including petitioner, had a key so that the office was accessible to them at all times. The room itself was equipped with a desk and chair for each graduate assistant, a telephone, typewriter, bookshelves, bookcases, etc., and had fluorescent lights on the ceiling. Petitioner and the other graduate assistants used the room to meet with their respective student-advisees. As a result, the common office facility could become crowded and noisy during office hours.

Petitioner usually spent the day, from 10 a.m. to 5 p.m., at the university either attending or teaching a class or in his office; after 5 p.m., petitioner returned to his apartment. During 1971, petitioner resided alone in a one-bedroom rental apartment.[5] The bedroom, bathroom, and kitchen were each separated from the other parts of the apartment; the living and dining areas, while

---

[4] The then-chairman of the Industrial Arts Education Department testified that while in 1971 it was customary for the university to provide graduate assistants with office facilities, he was unaware of any written policy or requirement that such facilities be provided.

[5] The record does not indicate the distance between petitioner's apartment and his office at the university, nor do we know what mode of transportation was available and/or used by petitioner to travel between the two points.

distinct, were not structurally separate rooms. Petitioner furnished a portion of the living room area with a desk and chair, bookshelves, and file drawers, thereby creating office space in the apartment. Petitioner used this office for purposes of both his studies as a graduate student and his responsibilities as a graduate assistant. In the former capacity, petitioner used the office to study and write; in respect of his graduate assistantships, petitioner prepared some of his teaching materials in his apartment and also checked the mechanical drawings submitted by the undergraduate students as a requirement of one of two courses that petitioner taught during his three-quarter-time assistantship.

On his individual income tax return for 1971, petitioner reported gross income from wages, salaries, etc., in the amount of $4,150. The wage and tax statements appended thereto indicate total wages paid subject to withholding in 1971 of $550 from the Pittsburgh School District and $5,535 from the Pennsylvania State University. Of this latter figure, petitioner excluded from gross income the total $1,935 paid in respect of his one-quarter-time and three-quarter-time graduate assistantships ($720 and $1,215, respectively).

Among the itemized deductions on Schedule A, petitioner claimed a miscellaneous deduction of $936 designated as "office-in-home," which amount represents one-half of petitioner's rent and electricity expenses for his apartment during 1971.

In the statutory notice issued to petitioner on January 16, 1974, respondent determined that the $1,935 received from the university is not excludable under the provisions of section 117. In respect of the office-in-home deduction, respondent disallowed $468 of the $936 claimed for failure to establish that such amount was an ordinary and necessary business expense pursuant to section 162.

OPINION

The instant case presents two issues for our determination: (1) Whether the stipends received by petitioner in 1971 from the Pennsylvania State University in respect of the one-quarter-time and three-quarter-time graduate assistantships held by petitioner ($720 and $1,215, respectively) are excludable from gross income pursuant to section 117; and (2) whether petitioner is entitled to deduct under section 162(a) the amount of $468 as expenses (rent

and electricity) of maintaining an office in his apartment for the 6-month period in 1971 during which petitioner held the afore-mentioned graduate assistantships.[6] Both parties recognize the potential inconsistency of the two issues; petitioner has conceded that if he prevails on the section 117 issue, he will not be entitled to the deduction claimed under section 162(a).

In respect of the applicability of section 117,[7] petitioner contends in general that the stipends paid pursuant to his one-quarter- and three-quarter-time graduate assistantships were intended both to provide financial assistance to enable petitioner to maintain his graduate studies and to further his graduate education and training since the assistantship responsibilities, particularly the teaching aspect of the three-quarter-time assistantship, comported with his expressed vocational aims. Petitioner claims that as a graduate assistant, he was not an employee of the university nor did he perform substantial services for the university.

Respondent, on the other hand, characterizes the stipends as compensation for services rendered and, as such, includable in petitioner's gross income pursuant to section 61. Respondent argues that the stipends paid were not based on petitioner's

---

[6] As indicated in our findings of fact, *supra,* respondent apparently does not challenge that portion of the deduction claimed which is attributable to the period (January through June) during which petitioner was employed as an instructor at the university.

[7] SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS.

(a) GENERAL RULE.—In the case of an individual, gross income does not include—

  (1) any amount received—

    (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or

    (B) as a fellowship grant,

including the value of contributed services and accommodations; and

  (2) any amount received to cover expenses for—

    (A) travel,

    (B) research,

    (C) clerical help, or

    (D) equipment,

which are incident to such a scholarship or to a fellowship grant, but only to the extent that the amount is so expended by the recipient.

(b) LIMITATIONS.—

  (1) INDIVIDUALS WHO ARE CANDIDATES FOR DEGREES.—In the case of an individual who is a candidate for a degree at an educational institution (as defined in section 151(e)(4)), subsection (a) shall not apply to that portion of any amount received which represents payment for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or the fellowship grant. If teaching, research, or other services are required of all candidates (whether or not recipients of scholarships or fellowship grants) for a particular degree as a condition to receiving such degree, such teaching, research, or other services shall not be regarded as part-time employment within the meaning of this paragraph.

asserted financial need but rather were commensurate with the required hours of service indicated in the offers made in respect of the graduate assistantships. As more fully discussed *infra,* respondent contends that, notwithstanding that the graduate assistantships may have incidentally enhanced petitioner's endeavors as a graduate student, the graduate assistantships herein were in essence intended to serve the needs of the Industrial Arts Education Department by supplementing the full-time faculty. It was for the performance of this function that petitioner received the stipends in issue; accordingly, respondent concludes that the stipends are not scholarships within the meaning of section 117 as set forth in both the regulations and case law thereunder.

By its terms, section 117(a) accords exclusion from gross income to those amounts received as scholarships or fellowship grants. See n. 7 *supra.* As respondent suggests, application of section 117 requires a threshold determination as to whether the stipends received by petitioner herein constitute a scholarship within the intendment of section 117(a). *Elmer L. Reese, Jr.,* 45 T.C. 407 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967). As defined in section 1.117-3(a), Income Tax Regs., "A scholarship generally means an amount paid or allowed to, or for the benefit of, a student, whether an undergraduate or a graduate, to aid such individual in pursuing his studies." The regulations go on to qualify the term as follows:

Sec. 1.117-4. Items not considered as scholarships or fellowship grants. ·

The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117:
  * * *

(c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.* (1) Except as provided in paragraph (a) of §1.117-2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.

However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services

described in subparagraph (1) of this paragraph. Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant.

These regulations reflect "the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial *quid pro quo* from the recipients." *Bingler v. Johnson,* 394 U.S. 741, 751 (1969). Thus, as we previously stated in *Geral W. Dietz,* 62 T.C. 578, 584 (1974):

> The crucial test of the above regulations [sec. 1.117-4(c)] is whether the primary purpose of the amounts paid is to further the education and training of the recipient or to compensate him for services rendered. *Elmer L. Reese, Jr.,* 45 T.C. 407, 411 (1966), affirmed per curiam 373 F.2d 742 (C.A. 4, 1967). More succinctly, the question is whether the taxpayer was "paid to work or paid to study." *Stephen L. Zolnay,* 49 T.C. 389 [p. 396] (1968).

We note at the outset that both *Elmer L. Reese, Jr., supra,* and *Stephen L. Zolnay,* 49 T.C. 389 (1968), involved the question of whether the payments to the respective taxpayers were scholarships in a context where services (teaching in the *Reese* case and research in the *Zolnay* case) were required as both a condition for receiving the amounts paid and as a degree prerequisite. Herein, no such "dual condition" applies; the terms of the offers of both the one-quarter- and three-quarter-time assistantships clearly specified a quantum of services to be rendered but such services were not required as a condition for petitioner's graduate degree. Thus, applying the principles of *Elmer L. Reese, Jr., supra,* and *Stephen L. Zolnay, supra,* to the facts of the instant case where the nexus between the services and petitioner's education and/or training is absent, we might, a fortiori, conclude that petitioner's stipends constitute compensation and as such fall outside the ambit of section 117.

Petitioner's apparent efforts in the preparation and presentation of his case, however, warrant fuller analysis. Accordingly, we proceed with an examination of the facts herein in order to ascertain whether the stipends received by petitioner possess the requisite scholarship characteristics or represent a quid pro quo proscribed by the regulations. *Stephen L. Zolnay, supra; Thomas P. Phillips,* 57 T.C. 420 (1971).

In support of his position that the stipends were paid primarily to further his education and training rather than to compensate for services, petitioner emphasizes that no formal employee-employer relationship arose between himself and the university by virtue of the graduate assistantships. Petitioner points to the university's classification of employees whereby graduate assistants were neither regular nor nonregular employees and enumerates certain benefits and privileges which manifest a distinction between the status of university employees and that of graduate assistants. Petitioner further notes that the fact that the university withheld Federal income and social security taxes from the stipend payments is alone not determinative of an employee-employer relationship. While we agree that little weight is to be accorded the mere fact of withholding, see *Chander P. Bhalla,* 35 T.C. 13, 17 (1960), we do not believe that the inquiry as to whether petitioner, as a graduate assistant, was formally an employee of the university is itself determinative. As the Supreme Court noted in *Bingler v. Johnson, supra* at 758 n. 32, the general intent of the regulations is to proscribe any quid pro quo, not necessarily that confined to the employer-employee context. Thus, the absence of a formal employment relationship does not of itself preclude a finding that petitioner's stipends were compensatory in character.

Petitioner asserts, however, that the stipends were not paid to compensate him for services but rather to provide the financial assistance which he needed to continue his graduate studies. We do not dispute that the prospective elimination of petitioner's instructorship position, coupled with petitioner's inability to secure the grant-in-aid for which he had applied, may have created financial difficulties for petitioner, nor do we doubt that the chairman of the Industrial Arts Education Department, who was also petitioner's academic adviser, was aware of these facts and genuinely interested in helping petitioner to maintain his graduate program. None of these factors derogate from what we believe to be the primary purpose of the graduate assistantships as providing planning and teaching services for the benefit of the department and for which services the stipends were, quite simply, compensation. Compare *Robert Henry Steinman,* 56 T.C. 1350 (1971). Indeed, we think the distinction made between "fellowships" and "graduate assistants" in the manual for graduate students which we have quoted in our findings of fact

emphasizes that the stipends received by "fellows" are to aid them in their studies while the stipends received by "graduate assistants" are to compensate them for services performed.

In a general sense, income from any source is financial assistance of a sort, but the application of that income to alleviate financial needs obviously does not convert the character of that income to a scholarship if it is in fact received as compensation for services; the fact that the graduate assistantships provided petitioner with income which he needed to meet his financial obligations does not render that income any less compensation for services than if, for example, the instructorship previously held by petitioner was reinstated and petitioner was then able to use the salary therefrom to meet his financial needs. Specifically, as to the actual amounts paid, the fact that assistantships were defined as one-quarter, one-half, and three-quarter time by general reference to the weekly hours of service of a full-time instructor with proportionate stipend ranges disparages petitioner's contention that the stipends reflected financial need and instead buttresses their compensatory character.[8]

Nor do we find that petitioner's graduate assistantships were substantively designed for the primary purpose of furthering petitioner's education and training. As we noted above, no research or teaching activities were required of petitioner as a condition for obtaining his degree. Petitioner may have derived some incidental educational benefits by virtue of his graduate assistantships, but "Close academic relationship of the services is not in and of itself sufficient." *Stephen L. Zolnay, supra* at 396.[9]

Both the testimony of the chairman of the Industrial Arts Education Department as to the personnel considerations involved in determining the graduate assistantships to be requested from the university and the fact of the elimination of the instructorship position indicate that, realistically, petitioner's graduate assistantships were intended primarily to serve the staff needs of the department. Compare *Frederick A. Bieberdorf,* 60 T.C. 114 (1973), *George L. Bailey,* 60 T.C. 447 (1973), and *Thomas P. Phillips, supra,* with *Edward A. Jamieson,*

---

[8] We accord little significance to petitioner's assertion that he in fact performed less service hours than required. Even were we to make such a finding, which we do not, the fact that petitioner performed less services than originally contemplated does not alter the compensatory character of the stipends. See *Donald R. DiBona,* T.C. Memo. 1968-214.

[9] See also *Edward Charles DeFabo,* T.C. Memo. 1975-282. Cf. *Aloysius J. Proskey,* 51 T.C. 918, 925 (1969); *Frederick Fisher,* 56 T.C. 1201, 1215 (1971).

51 T.C. 635 (1969). Indeed, the instant case is essentially similar to that of *Edward A. Jamieson, supra,* where in holding that payments received pursuant to a teaching assistantship held by the taxpayer, a candidate for a Ph.D. for which teaching was not required, were not excludable scholarships or fellowship grants under section 117(a), we described the teaching assistantship as based less on the taxpayer's financial need than on the number of unfilled faculty positions. This description likewise applies to the graduate assistantships herein.[10]

In sum, we conclude that petitioner was in fact "paid to work;" as compensation for services rendered under petitioner's graduate assistantships, the stipends paid in respect thereto lack the requisite character of a scholarship and accordingly fail to qualify for the exclusion provided by section 117.

With regard to the second issue of whether petitioner is entitled to deduct the expenses (rent and electricity) of maintaining an office in his apartment attributable to the period during which he held the graduate assistantships (July through December 1971), petitioner argues in essence that the shared office facility provided by the university was not suitable for the proper discharge of his responsibilities under both graduate assistantships. Specifically, petitioner emphasizes the noise, poor lighting, lack of adequate space, and crowded condition of the university-provided office and contends that the living room area in his apartment which he converted to office use was, in contrast, more conducive to both his studies as a graduate student and his duties as a graduate assistant. Accordingly, petitioner contends that his use of his apartment as an office was appropriate and helpful within the meaning of section 162(a) such that the expenses attributable thereto are properly deductible.

The evidence fails to support petitioner's assertions as to both the inadequacy of the office of the university and the necessity of petitioner's respective assistantship duties. The evidence indicates that petitioner's use of the office in his apartment for purposes of his graduate assistantship work was minimal and infrequent at best. We are convinced that petitioner's use of his apartment office area for purposes of his graduate assistantships reflected personal preference and convenience rather than

---

[10] See also *Logan v. United States,* 518 F.2d 143 (6th Cir. 1975); *Worthington v. Commissioner,* 476 F.2d 589 (10th Cir. 1973), affg. per curiam a Memorandum Opinion of this Court; *Edward Charles DeFabo, supra; Allen J. Workman,* T.C. Memo. 1974-5.

employment exigencies and also that use of his apartment office was predominantly personal, devoted more to studying and writing in connection with his graduate program than performing his duties as a graduate assistant. Thus, the expenses in issue are personal expenses, deduction of which is proscribed by section 262.

In our recent opinion in *Joel A. Sharon,* 66 T.C. 515 (1976), in announcing that we shall no longer follow our prior opinion in *Stephen A. Bodzin,* 60 T.C. 820 (1973), revd. 509 F.2d 679 (4th Cir. 1975), cert. denied 423 U.S. 825 (1975), we stated:

> It is true that the Supreme Court has interpreted the word "necessary" as used in a predecessor of section 162(a) to mean "appropriate and helpful" in "the development of petitioner's business." *Welch v. Helvering,* 290 U.S. 111, 113 (1933). It is also true that the petitioner's utilization of a room in his apartment for occasional office work was appropriate and helpful in his work in the sense that it was fitting, proper, and useful. However, that is not sufficient for the purposes of section 162(a). The "appropriate and helpful" concept is not a litmus test. Where there is a mixture of personal and business considerations, that test, like the statutory "ordinary and necessary" test, requires a weighing and balancing of all the facts so that they may be given the proper order of importance, bearing in mind the precedence of section 262, which denies deductions for personal expenses, over section 162, which allows deductions for business expenses. * * * [66 T.C. at 524.]

Thus, the "appropriate and helpful" test relied on by petitioner is not determinative; we instead focus on section 262 and specifically section 1.262-1(b)(3) of the regulations thereunder which provides:

> (3) Expenses of maintaining a household, including amounts paid for rent, water, utilities, domestic service, and the like, are not deductible. A taxpayer who rents a property for residential purposes, but incidentally conducts business there (his place of business being elsewhere) shall not deduct any part of the rent. If, however, he uses part of the house as his place of business, such portion of the rent and other similar expenses as is properly attributable to such place of business is deductible as a business expense.

Applied in the context of the instant case, this regulation clearly precludes deduction of the rent and electricity expenses at issue. Quite succinctly, petitioner's office area in his living room does not constitute a "place of business," in terms of either quantum or quality of activity, as contemplated by the regulation. As in *Joel A. Sharon, supra,* where the taxpayer maintained an apartment for residential purposes and incidentally used a spare bedroom as an office in which to do some reading and writing in

connection with his employment, petitioner's use of the office area in his living room for some reading, preparation and checking of mechanical drafts pursuant to his various graduate assistantship responsibilities does not rise to the dignity of a "place of business."

Although we believe that the rationale of *Joel A. Sharon, supra,* controls the instant case, we derive further support for our conclusion herein by analogy to the rule in *Fausner v. Commissioner,* 413 U.S. 838 (1973), in respect of commuting expenses:

Congress has determined that all taxpayers shall bear the expense of commuting to and from work without receiving a deduction for that expense. We cannot read §262 of the Internal Revenue Code as excluding such expense from "personal" expenses because by happenstance the taxpayer must carry incidentals of his occupation with him. Additional expenses may at times be incurred for transporting job-required tools and material to and from work. Then an allocation of costs between "personal" and "business" expenses may be feasible. * * * [413 U.S. at 839; fn. refs. omitted.]

Petitioner herein incurred no additional expenses by virtue of his use of a portion of his living room as office; rather, the expenses for rent and electricity at issue are expenses which petitioner would otherwise have incurred incident to his residential use of the apartment. Just as the incidental and occasional performance of graduate assistantship work does not convert petitioner's living room into a place of business neither does it convert nondeductible, personal living expenses into business expenses. Section 262 admits of no such alchemy.

On the basis of the foregoing, we hold that the amount of $1,935 received by petitioner as stipends in respect of the graduate assistantships held by him does not constitute a scholarship qualifying for the exclusion from gross income provided under section 117; accordingly, such amount is includable in petitioner's gross income in 1971 pursuant to section 61. We hold further that the rent and electricity expenses relating to petitioner's maintenance of an office in his apartment constitute personal expenses, nondeductible under section 262, in respect of which petitioner is not entitled to the $468 deduction claimed.

*Decision will be entered for the respondent.*