DAVID G. AND CHERYL P. HOF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hof v. Commissioner
Docket No. 7040-76.
United States Tax Court
T.C. Memo 1979-55; 1979 Tax Ct. Memo LEXIS 472; 38 T.C.M. (CCH) 221; T.C.M. (RIA) 79055; February 14, 1979, Filed *472 Petitioner was an intern and resident of Veterans Administration Hospital. The residency was affiliated with the University of Minnesota graduate and medical school which maintained ultimate control of the program. While a resident, petitioner received payments from the Hospital and the University. These payments represented compensation for present employment services that were subject to direction or supervision of grantors. Held, the payments are not excludable scholarship or fellowship grants. Section 117(a), I.R.C. 1954. Harry N. Ray, for the petitioners. Dale L. Newland, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined a deficiency of $ 1,267 in petitioners' income tax for the taxable year 1974. Due to concessions, the only issues remaining for our decision are: (1) whether certain funds received by petitioner, David G. Hof, from the University of Minnesota and Veterans Administration Hospital are excludable from gross income pursuant to sections 117(a) and 117(b)(2)(B); [1] and (2) whether petitioners *474 are entitled to trade or business deductions under section 162 for home office expenses. FINDINGS OF FACT Some of the facts have been stipulated. The findings of fact, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners, David G. and Cheryl P. Hof, husband and wife, timely filed a joint Federal income tax return for the *475 calendar year 1974 with the District Director of Internal Revenue, Ogden, Utah. They also timely filed an amended return for 1974. At the time they filed their petition herein, petitioners resided in Burnsville, Minnesota. Because Cheryl P. Hof is a petitioner herein solely by reason of her filing a joint return, references hereafter to petitioner are to David G. Hof. After graduating in 1973 from the University of Missouri Medical School with a doctorate in medicine, petitioner submitted an application to the University of Minnesota Hospitals, Minneapolis, Minnesota, for an internship in internal medicine, and was accepted in the graduate program as a medical fellow specialist (in the medical school). Petitioner then entered into an agreement with the University of Minnesota and the Veterans Administration Hospital (hereafter Hospital) with respect to an internship in internal medicine between June 1973 and July 1974. Unlike most other educational facilities, the University of Minnesota (hereafter University) in 1935 organized graduate education in the medical field beyond internship programs within the University.It thereafter developed a medical fellowship program structured *476 and organized to meet the traditional standards of academic and educational institutions. Under the University's system there are actually two programs within the general graduates' program, one within the graduate school and one within the medical school. Students in either program, however, pay tuition and fees to the school thereby entitling them to all student privileges. The student is then given an appointment as either a medical fellow, for those enrolled in graduate school, or a medical fellow specialist, for those enrolled in the medical school, so that the University may provide a stipend. The stipend is used as a means of attracting persons into the University's program but is not based on financial need. Much of the funds used to pay the stipends come from a variety of public and private foundations including the State of Minnesota. [2]
Those students enrolled in the graduate school are in a degree program leading to either a Masters degree or Ph.D in one of the clinical programs in the health sciences (including internal medicine). *477 Those enrolled in the medical school as graduate level students also are registered in the graduate school but are not candidates for degrees and are admitted only for course work. The nondegree candidate program has been accredited by the American Board on Internal Medicine. However, depending on the courses a student takes, it is possible for a student in the degree program to receive a Ph.D in internal medicine but not meet the certification standards of the American Board of Internal Medicine. The choice of which program to enter depends upon each student's particular education goal; each student is assigned an advisor and course structure is based upon the advisor's recommendations. Upon satisfactory completion of his courses, the student gets a grade which is then entered into a transcript which, in the traditional way, summarizes his education. Gradually, the United States Government became aware that the structure of graduate education ought to be changed and in 1965, the Coggeshall Report directed medical schools to take a greater responsibility for graduate education. Then, in 1968, a conference report of the Council of Academic Societies in a report to the American *478 Association of Medical Colleges proposed that universities encourage their medical faculties to assume the same sort of responsibility for graduate education that they had for undergraduate medical education and in ways similar to that which the University had been doing since 1935. Thereafter, in 1973, the American Medical Colleges issued a statement which read in part: The undergraduate period of medical education leading to the M.D. Degree is no longer sufficient to prepare a student for independent practice without supplemental education by a graduate training program, which may vary in length, depending on the type of practice that the student selects. This type of report eventually led to the nationwide abolishment of internships in 1974 and in the University's internships in June 1974. Until then, the internship was essentially a free-standing year between medical school and more formal graduate education, lacking supervision and organization, and primarily serving individual hospitals and physicians. Although internships had some educational objectives, those objectives were not established by the University, which did not consider an intern a student but rather as *479 someone engaged in training. Internships were thus now generally incorporated into residency programs; at the University, the internship was incorporated into the medical fellowship program. However, graduate education of M.D. degree holders at the University remained structured within the University unlike the traditional internships and residencies in the remainder of the country. There apparently are few, if any, other medical fellowship programs in the United States which are organized solely within the confines of the university, and which are responsible to the university within the traditional framework of an educational institution. In order to meet its objective, the University needed use of outside resources and, therefore, developed affiliations in the Twin Cities with a number of hospitals which then became the clinical and educational arm of the University under the University's control and direction. The University assigns one of its faculty members to a group of three or four medical fellows and and other students in allied health fields to supervise the clinical work. Students are sometimes rotated by the University to various hospitals in order to be exposed *480 to different kinds of clinical medicine. A first-year resident at the Hospital was assigned the following duties: (1) do a history and physical examination on every patient admitted to his team and discuss with the staff physician and the second-year resident his findings and suggested plans for the patient's care; (2) manage the patient's care and arrange for his follow-up care; (3) attend to patients' management problems every second to third night from 5:00 p.m. until 8:00 a.m.; and (4) perform duties as required on the weekends. During the second-year, a resident at the Hospital had the following duties: (1) be responsible for the actions of the first-year resident member of the patient care team; (2) manage the patients' care and arrange for follow-up care; (3) perform follow-up care in a clinical setting on patients with whom he had been involved while they were in the hospital; (4) perform teaching services of first-year residents and medical students assigned to the team; (5) be responsible for patient management problems every sixth night; (6) be responsible for emergency room treatments every sixth night; and (7) perform duties as required on the weekends. Petitioner *481 performed the following duties while at the Hospital: gave physicals to newly admitted patients and recorded the findings on a medical chart; wrote daily progress notes; wrote discharge orders; dictated case summaries; gave or assisted in giving emergency treatment; prepared patients for surgery; commenced administration of intravenous fluids; inserted nasal gastric tubes; and changed dressings and removed sutures. However, while an intern during 1974, petitioner had no primary or direct responsibility for the care or treatment of patients. For each of the duties performed by him in 1974 and described above, he was subject to the supervision and direction of the Veterans Hospital medical staff. During the taxable year ended December 31, 1974, petitioner was assigned exclusively to the Hospital in Minneapolis. During 1974 he received $ 9,820.08 from the University of Minnesota and $ 2,089.40 from the Hospital. Both the University and VA Hospital withheld Federal income tax and FICA tax. Petitioner was paid the same amount and received the same fringe benefits as the other interns during the period January 1, 1974 through June 30, 1974. He was also paid the same amount and received *482 the same fringe benefits as other similarly situated resident physicians during the period between July 1, 1974 through December 31, 1974. He received medical and hospital insurance coverage as well as malpractice protection from the Hospital, and meals during late duty hours. Additionally, his lab coats were laundered by the Hospital. Payments to interns and residents were not based on the intern's or resident's financial need. Rather, petitioner's increased payment as a resident in the last six months of 1974 was due to his increased experience acquired as an intern. As noted in footnote 1, supra, petitioner excluded the full amount of the stipend from his gross income.
With respect to the home office expense deduction claimed by petitioner, the total utilities, insurance, and telephone expenses for petitioner's home were $ 680. On his amended return, petitioner deducted one-fifth of these expenses [3] and an additional $ 130 for depreciation. The total square footage of the room claimed to be used as an office in the home was 160 square feet. The total square footage of the remaining rooms in the house was 1,130 square feet. *483 Respondent disallowed any deduction for the home office and included the full amount of stipend in petitioner's income.
OPINION A scholarship or fellowship grant is excludable from income under section 117(a). Although "scholarship" and "fellowship grant" are not defined in the statute, section 1.117-3(c) of the Income Tax Regulations provides: "A fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." In addition, section 1.117-4(c)(1) of such regulations states that if any "amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor," it does not qualify for exclusion under section 117. The Supreme Court upheld the validity of these regulations and stated that the definitions contained therein comport with "the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement *484 of any substantial quid pro quo from the recipients," Bingler v. Johnson,394 U.S. 741 (1969). The test to be applied under the regulations is whether the primary purpose for making the payments to the taxpayer was to educate and train him or to compensate him for services rendered. Weinberg v. Commissioner,64 T.C. 771 (1975); Carroll v. Commissioner,60 T.C. 96 (1973); Proskey v. Commissioner,51 T.C. 918 (1969); Reese v. Commissioner,45 T.C. 407 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967).Thus, even if the primary purpose of the University or hospital is to train interns and residents, the stipends do not qualify under section 117 if the primary purpose for payment was to compensate the recipients for medical services. Rosenthal v. Commissioner, 63 T.C. 454, 460 (1975). Respondent contends that the primary purpose of the payments was to compensate petitioner for services rendered. Petitioner argues that the stipend was not payment for services. [4]
*485 We agree with respondent that petitioner rendered extensive and valuable services to the Hospital, as set forth in our findings of fact. In return, the Hospital and University paid petitioner $ 2,089.40 and $ 9,820.08, respectively, the effect of which was clearly to provide a quid pro quo. Petitioner, however, attempts to minimize the value of his services by pointing to a low staff/patient ratio. This, he argues, can be attributed only to the fact that the staff was engaged in a substantial amount of training and that the staff would have handled substantially more patients if it were not for their assignments to train the residents. However, the fact that staff physicians spent a considerable period of time supervising interns and residents is not necessarily inconsistent with an employer-employee relationship. Fisher v. Commissioner,56 T.C. 1201, 1215 (1971). Moreover, we do not believe the record supports petitioner's contention that the hospital could have cared for as many or more patients as effectively without the residents as it did with the residents. We hold, therefore, that the primary purpose of the payments was to compensate petitioner for *486 these services. [5]Bingler v. Johnson,supra;Adams v. Commissioner, 71 T.C.     (1978). The fact that petitioner had no primary responsibility for the care of patients is not inconsistent with his receiving compensation, Brubakken v. Commissioner,67 T.C. 249, 251 (1976). Petitioner also argues that because the program received payments from a variety of public and private sources, the intent of the program could not have been to compensate interns. An implicit assumption in this argument is that these sources are the grantors of the funds. However, it is clear that the residency program should be considered the *487 grantor of the stipend.The grants were given directly to the University; it chose petitioner to participate in the program; and thereafter, it controlled and was responsible for petitioner's training. Bailey v. Commissioner,60 T.C. 447, 452 (1973). Moreover, there is no proof that any of the organizations restricted the use of their funds to compensate interns for their medical services. Besides the nature and extent of services rendered, two other factors support the conclusion that the payments by the Hospital and University constituted compensation. First, petitioner's increased payment as a resident in the last six months of 1974 was due to his increased experience acquired as an intern and not because of financial need. Adams v. Commissioner,supra; Brubakken v. Commissioner,supra, at 259; Dietz v. Commissioner,62 T.C. 578, 586 (1974); Proskey v. Commissioner,51 T.C. 918, 924 (1969). Second, petitioner received medical and hospital insurance as well as malpractice protection from the Hospital and the Hospital and University both treated his "stipend" as compensation by withholding income *488 taxes and FICA taxes as wages and salaries. [6]Adams v. Commissioner,supra, Brubakken v. Commissioner,supra;Weinberg v. Commissioner,64 T.C. 771, 778 (1975), Proskey v. Commissioner,supra, at 924. Petitioner attempts to distinguish this case from the usual intern and residency cases, however, by pointing to the control maintained by the University and the status of the University's program which incorporated the clinical experience into a systematic course of instruction. A similar contention was raised in Rosenthal v. Commissioner,supra, and we agree with respondent that that case disposes of petitioner's arguments here. There, the Marquette Graduate School in affiliation with Marquette Medical School and six hospitals in Milwaukee, Wisconsin, operated a master of science and surgical residency program. The taxpayers received funds from both the County *489 of Milwaukee and the Veterans Hospital.During their surgical residence, the taxpayers were assigned to affiliated hospitals under a standard rotation schedule. Both the rotation schedule and the residency program as a whole were controlled by Marquette. Nonetheless, we held that "the payments in question constituted compensation for present services that were subject to the direction or supervision of the grantors." Although the University of Minnesota's program is different in certain respects from Marquette's, and petitioner was required to pay tuition, we nonetheless believe it is similar enough to compel the conclusion that the control exercised by the University is insufficient to justify a finding for petitioner. [7]
*490 Moreover, the internship in which petitioner was working prior to June 1974, by petitioner's own admission, generally lacked supervision and primarily served hospitals whose objectives were not established by University. We recognize that the payments were beneficial in enabling petitioner to further his education by helping defray expenses and by providing him with highly valuable training. However, this is not inconsistent with our finding that the stipends represented compensation. Adams v. Commissioner,supra, Brubakken v. Commissioner,supra, at 257-258; Proskey v. Commissioner,supra, at 925. Petitioner has apparently conceded the issue of the home office deductions. No evidence or testimony was presented at trial and no mention is made of the issue on brief. Accordingly, we hold for respondent. Due to concessions by petitioner, Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the year at issue. On their original income tax return, petitioners excluded only $ 3,600 pursuant to limitations in section 117(b)(2). On their amended return, petitioners excluded the full amount of the stipend ($ 11,909.48). At trial, petitioners orally moved for leave to file an amended petition in order to claim an exemption for the entire stipend, pursuant to section 117(b)(1)↩. This motion was granted by the Court on March 23, 1977, and petitioners were given until April 4, 1977 to file an amended petition with the Court. No amended petition was ever received, however, and therefore only the amount of $ 3,600 excluded on their original income tax return and claimed on their petition is actually in issue.
2. Specifically, the State appropriates money to the University which then provides financial support to participating hospitals.↩
3. On his amended return, petitioner stated that he owned a five-room home, one room of which was used as a home office.↩
4. Petitioner also argues that he was a degree candidate and not subject to the $ 3,600 limitation in section 117(b)(2) which applies to individuals not candidates for a degree. Since we hold section 117↩ does not apply, no amount is excludable from income. Accordingly, we do not address the issue of whether petitioner's program leading to Board Certification in Internal Medicine is tantamount to a degree program. Moreover, as noted in footnote 1, petitioner failed to amend his petition to claim a greater exclusion than that allowed to a non-degree candidate.
5. Both respondent and petitioner appear to view the amounts petitioner received from the University and the Hospital as inseparable parts of an interrelated and interdependent residency program. Since we believe the record would support such a conclusion, in the absence of any contentions by either party, we find the payments inseparable and payments from any one of the program's constitutent members must be considered as coming from the whole. Cf. Dietz v. Commissioner,supra,↩ at 584-585.
6. Of course, the fact of withholding alone is not determinative under section 117. Proskey v. Commissioner,supra, fn. 7 at 924. Cf. Meehan v. Commissioner,66 T.C. 794, 804↩ (1976).
7. See also Haygood v. Commissioner,T.C. Memo. 1977-71↩ where the taxpayer was a resident in the Tulane University department of surgery residency program while enrolled in the University's department of graduate and postgraduate medical studies. The taxpayer paid an annual registration fee to the University and the intern and residency program was coordinated with several hospitals but under the direction of the University; additionally, the taxpayer could be rotated to various hospitals.