ROLF F. ULVESTAD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ulvestad v. Commissioner
Docket No. 3767-76.
United States Tax Court
T.C. Memo 1979-60; 1979 Tax Ct. Memo LEXIS 467; 38 T.C.M. (CCH) 238; T.C.M. (RIA) 79060; February 21, 1979, Filed *467 Petitioner was an intern and resident of St. Paul-Ramsey Hospital. The residency was affiliated with the University of Minnesota graduate and medical school which maintained ultimate control of the program. While a resident, petitioner received payments from the Hospital. These payments represented compensation for present employment services that were subject to direction or supervision of the grantors. Held, the payments are not excludable scholarship or fellowship grants. Section 117(a), I.R.C. 1954. Harry N. Ray, for the petitioner. Dale L. Newland, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioner's Federal *468 income tax of $ 574.80 and $ 1,445.80 for the taxable years 1973 and 1974, respecttively. The only issue with which we are presented is whether petitioner is entitled to exclude from gross income amounts paid him by St. Paul-Ramsey Hospital as a scholarship or fellowship grant. FINDINGS OF FACT Some of the facts have been stipulated. The findings of fact, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner, Rolf F. Ulvestad, timely filed his income tax returns for the years 1973 and 1974 with the Internal Revenue Service Center, Ogden, Utah. At the time he filed his petition herein, petitioner resided in Minneapolis, Minnesota. In June 1973, petitioner graduated from the Medical School of the University of Minnesota (hereafter University) with a doctorate in medicine. Prior to his graduation, on November 25, 1972, petitioner submitted an application for an internship in Otolaryngology (Ear, Nose and Throat-ENT) with St. Paul-Ramsey Hospital (hereafter Hospital) as part of a six-year Ph.D. degree program in Otolaryngology developed by the University and with which the Hospital was affiliated. On April 16, 1973, petitioner *469 confirmed his acceptance into the Hospital's Internship Program and entered into an agreement with the Hospital. Under the terms of petitioner's agreement with the Hospital, he was paid a "salary" of $ 10,000 determined by the University and three affiliated hospitals "in consideration of such appointment and employment" and petitioner was prevented from engaging in any employment elsewhere. The Hospital withheld income taxes from petitioner's wages but did not withhold FICA taxes. Petitioner also received individual group hospital and major medical insurance at the Hospital's expense with the option to participate in the Hospital's dependents coverage program, liability and malpractice insurance at no cost, uniforms and laundry of uniforms, and two weeks of vacation on a scheduled basis. Funding for the Hospital's program comes from a variety of public sources, including appropriations from the State, but about half of the interns' and residents' compensation came from funds generated by patient revenues (although funds were not segregated as such). Apparently, under the University's program, a student must first complete a year of training before enrolling in the school *470 and it was not until petitioner's second year at the Hospital (mid-1974) that he actually enrolled in the University Medical School, and not until the beginning of his third year that he enrolled in the graduate school as a doctoral candidate. As a registered student at the University, petitioner was entitled to full student privileges. The University runs the ENT program by agreement with affiliated hospitals such as Ramsey, although the University maintains ultimate control of the program and the internship is an integral part of the program. Petitioner was rotated through a variety of disciplines while at the Hospital in order to gain needed experience in areas related to otolaryngology. He worked about 70 hours a week throughout the entire time he was with the Hospital. He also expected to be rotated to other hospital facilities by the University under the program. During his first year, the Hospital staff and interns would meet in the morning on the ward and make rounds of the patients.The patient's problem would be presented to the staff physician by the intern (who would have already prepared patient histories prior to the time the staff physician viewed the patient) *471 and later discussed by the interns with the staff. Later, the interns would assist the staff physician in the operating room after which there were group discussions of topics such as various laboratory reports and X-rays. In the afternoon, rounds would be made again. Petitioner also assisted in varying degrees in about six operations a week. At times, the interns would treat patients without any supervision. However, the procedure to be performed by the intern would have already been discussed with the staff physician. This training was necessary to petitioner in order to gain the necessary experience as a physician in ENT. There were approximately 60 full-time physicians and 17 part-time physicians on the Hospital's staff and about 88 or 92 residents during the years in issue. There were also about 200-250 physicians on the attending staff. The average in-patient load was about 320 daily and the number of out-patients numbered approximately 100,000 yearly. In addition, there were about 75,000 visits to the emergency room a year. Petitioner was paid the same amount and received the same fringe benefits as the other interns during the periods July 1, 1973 through June 30, 1974 and *472 as the other residents during the period July 1, 1974 through December 31, 1974. Residents' salaries were not based on financial need and petitioner received an increased payment as a resident during the last 6 months because of his increased experience acquired as an intern. [1]
Petitioner excluded the amounts he received from the Hospital from his gross income claiming they qualified as a scholarship under section 117[2] (except for $ 150 included in 1973). Respondent determined that the full amounts were compensation for services. OPINION A scholarship or fellowship grant is excludable from income under section 117(a). Although "scholarship" and "fellowship grant" are not defined in the statute, section 1.117-3(c) of the Income Tax Regulations provides: "A fellowship grant generally means an amount paid *473 or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." In addition, section 1.117-4 (c)(1) of such regulations states that if any "amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor," it does not qualify for exclusion under section 117. The Supreme Court upheld the validity of these regulations and stated that the definitions contained therein comport with "the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial quid pro quo from the recipients," Bingler v. Johnson,394 U.S. 741, 751 (1969). The test to be applied under the regulations is whether the primary purpose for making the payments to the taxpayer was to educate and train him or to compensate him for services rendered. Adams v. Commissioner, 71 T.C.     (1978); Weinberg v. Commissioner,64 T.C. 771 (1975); Carroll v. Commissioner,60 T.C. 96 (1973); Proskey v. Commissioner,51 T.C. 918 (1969); *474 Reese v. Commissioner,45 T.C. 407 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967). Thus, even if the primary purpose of the university or hospital is to train interns and residents, the stipends do not qualify under section 117 if the primary purpose for payment was to compensate the recipients for medical services. Rosenthal v. Commissioner,63 T.C. 454, 460 (1975). We believe petitioner rendered extensive and valuable services to the Hospital for which he was paid. Thus, we agree with respondent that the primary purpose of the payments made by the Hospital was to compensate petitioner for these services. Bingler v. Johnson,supra.
In order to discount the value of these services, petitioner relies heavily on the testimony of the Executive Director of the Hospital that the Hospital's operating budget would be less without the internship and residency programs and that the Hospital would not have to hire additional staff if the residents were not there (although admitting that there would have to be additions in some areas and reductions in others). Assuming that the Hospital could have provided *475 the same level of care and handled the same number of patients without the residents as it did with them, the same argument was raised and rejected in Brubakken v. Commissioner,supra, at 256, relying on Fisher v. Commissioner,supra, wherein we noted that although the hospital "could do without residents, it did not do without them; it used their services, and it paid for them." Nor do we believe the fact that the Hospital's operating budget without residents would be less than it was with the residents is necessarily significant. Obviously, the less staff one has the smaller the budget will be. It is far from clear from such testimony whether Hospital revenues would also decrease as a result of operating without the residents; funds provided by public sources for the program would, presumably, no longer be forthcoming even assuming the Hospital could handle as many patients. Moreover, we believe that in one important sense this ignores the issue at hand. Petitioner seems to focus on the purpose of the program rather than on the purpose of the payments. As we noted in Bailey v. Commissioner,60 T.C. 447, 452 (1973), "the purpose *476 of the hospital in making the grant is, in large part, suggested by the nature of the activities carried on by the petitioner." Thus, if petitioner's activities were substantial and rendered a benefit to the Hospital, it would not seem to be crucial that the Hospital incurred additional costs beyond those "needed" to perform adequately. We stated previously that such services were of a substantial benefit to the Hospital in the care and treatment of patients and that it was not important whether the primary purpose of the program was to train interns. It could well be that the program increased the Hospital's costs beyond that which it gained in increased revenue, but that does not mean that the payments to petitioner were to enable him to participate in the program rather than as payments for services provided by petitioner while in the program. Petitioner also points to the fact that he had no primary responsibility for the care of patients to downgrade the value of his services. But this is not inconsistent with his receiving compensation, Brubakken v. Commissioner,67 T.C. 249, 251 (1976). Besides the nature and extent of services rendered, three other *477 factors support the conclusion that the payments by the Hospital constituted compensation. First, petitioner's increased payment as a resident in the last six months of 1974 was due to his increased experience acquired as an intern and not because of financial need. Adams v. Commissioner,supra; Brubakken v. Commissioner,supra at 259; Dietz v. Commissioner,62 T.C. 578, 586 (1974); Proskey v. Commissioner,51 T.C. 918, 924 (1969). Second, petitioner was entitled to a two-week vacation, received medical and hospital insurance as well as malpractice protection from the Hospital and the Hospital treated his "stipend" as compensation by withholding income taxes (although not FICA taxes) from petitioner's salary.[3]Adams v. Commissioner,supra; Brubakken v. Commissioner,supra, at 924. Third, the contract which petitioner signed with the Hospital refers to the $ 10,000 he was to receive as "salary * * * in consideration of such appointment and employment" indicating that the Hospital did, in fact, consider the payments to be compensation. Moreover, the fact that petitioner agreed not to engage in his *478 profession elsewhere while at the Hospital is more like an employment contract than a "no-strings attached" stipend. Petitioner also rests heavily on the control maintained by the University over the program. It is petitioner's contention that because the Hospital is the grantor of the stipend [4] and the University maintained control of the program, the payment for services is not subject to the grantor's control and thus qualifies as a stipend. See section 1.117-4(c)(1), Income Tax Regulations. However, it is not clear from the record how much control of petitioner's responsibilities and duties in the internship program was maintained by the University and how many of his duties were directed by the *479 Hospital; the record does not indicate whether the University directed petitioner's activities within the Hospital or if the residency program was set up according to specific University standards, only that the University maintained ultimate control over the Ph.D. program. Cf. Rosenthal v. Commissioner,supra;Haygood v. Commissioner,T.C. Memo. 1977-71. [5]
*480 Moreover, if the University directed the program to the extent suggested by petitioner, and the Hospital was affiliated with the program, we believe the University and Hospital should be viewed as inseparable parts of an interrelated and interdependent residency program. Thus, we do not find persuasive the fact the salary was set by the Hospital in conjunction with the University and other affiliated hospitals. To the extent that these organizations are part of an interrelated and interdependent residency program, one would expect the participating members to jointly arrive at such amounts. Cf. Dietz v. Commissioner,supra.Therefore, the grantor of the stipend here directed petitioner's services and paid his salary. Finally, although we recognize that the payments were beneficial in enabling petitioner to further his education by helping defray expenses and providing him with highly valuable training, this is not inconsistent with our finding that the stipends represented compensation. Adams v. Commissioner,supra; Brubakken v. Commissioner,supra, at 257-258; Proskey v. Commissioner,supra, at 925. *481 Decision will be entered for the respondent.
Footnotes
1. Although not clear from the record, petitioner was apparently an intern through June 1974 and a resident beginning in July 1974.↩
2. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years at issue.↩
3. Of course, the fact of withholding alone is not determinative under section 117. Proskey v. Commissioner,supra, n. 7 at 924. Cf. Meehan v. Commissioner,66 T.C. 794, 804↩ (1976). Nor do we place much weight on the fact that FICA tax was not withheld. Considerations that may play a roll in exempting an employee from FICA do not necessarily have any bearing on whether an individual is exempt from income tax.
4. To the extent that petitioner implies that the actual public sources of the funds used by the Hospital to pay the stipends are the grantors, we note that since the grants were apparently given directly to the Hospital (or the program as a whole), the Hospital chose petitioner to participate in the program, and thereafter controlled and was responsible for his training, the Hospital must be considered the grantor. Bailey v. Commissioner,supra.↩
5. Petitioner urges us to consider as evidence in this case the testimony of one of the witnesses describing the University's program in the case of Hof v. Commissioner,T.C. Memo. 1979-55, heard the day before the trial of this case, at least as to where it is relevant and not inconsistent with the record here. As we noted in Eckes v. Commissioner,T.C. Memo. 1978-192, at n. 2, we are unaware of any legal theory by which evidence received in one case may be incorporated into the record of another case (at least without both parties' agreement). In any event, we held in Hof,↩ on a much more detailed record describing the University of Minnesota program, that the program was not sufficient, by itself, to compel a conclusion that payments were excludable from income.